IN THE MATTER OF: JOHN WILLIAM ELKINS, APPLICANT TO THE FEBRUARY 1981 NORTH CAROLINA BAR EXAMINATION

No. 601A82

(Filed 3 May 1983)

1. **Attorneys at Law § 2— judicial review of decision of Board of Law Examiners**
    The findings and conclusions of the Board of Law Examiners are judicially reviewed under a "whole record" test to determine if they are supported by "substantial evidence."

2. **Attorneys at Law § 2— admission to practice—good character—burden of proof**
    An applicant for admission to the practice of law has the initial burden of proving his good character, and if the Board of Law Examiners relies on specific acts of misconduct to rebut a *prima facie* showing of good character, and such acts are denied by the applicant, then the Board must establish the specific acts by the greater weight of the evidence.

3. **Attorneys at Law § 2— criminal convictions—evidence of lack of good moral character**
    The Board of Law Examiners could properly consider an applicant's criminal convictions as evidence of the applicant's lack of good moral character.

4. **Attorneys at Law § 2— denial of application to take Bar Examination—lack of good moral character—sufficiency of evidence and findings**
    There was substantial evidence to support findings by the Board of Law Examiners that an applicant to take the N.C. Bar Examination entered the at-

tic above his apartment and the adjoining apartment of three women and drilled holes from the attic through the ceiling of the women's apartment for the purpose of secretly peeping into the bathroom and a bedroom of the adjoining apartment, that he took his camera into the attic with the specific intent of photographing the female occupants of the adjoining apartment, and that specific statements in the applicant's answers to interrogatories in a prior civil suit instituted by the females against defendant and in his testimony under oath before the Board were untrue and given by him with intent to deceive the court in the prior action and the Board. Such findings were sufficient to rebut the applicant's *prima facie* showing of good moral character and to support the Board's conclusion that the applicant presently lacks such good moral character as to be entitled to take the N.C. Bar Examination.

APPEAL as a matter of right, pursuant to Section .1405 of the Rules Governing Admission to the Practice of Law, from the Judgment of *Battle, Judge,* Superior Court, WAKE County, entered 26 May 1982, ordering the North Carolina Board of Law Examiners [hereinafter "Board"] to issue John William Elkins a license to practice law if he made a passing grade on the February 1981 Bar Examination.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Harry H. Harkins, Jr., for Board of Law Examiners appellant.*

*Sapp & Mast, by Robert H. Sapp for applicant appellee.*

MITCHELL, Justice.

The issues presented by the Board's appeal are whether there is substantial evidence to support the Board's findings of fact and whether the findings that the applicant was guilty of misconduct and false testimony are sufficient to deny the applicant's admission to the Bar. We hold that the Board's findings were supported by substantial evidence and the findings support the Board's conclusion that the applicant presently lacks the requisite good moral character for admission to the Bar.

John William Elkins is an applicant for admission to the North Carolina Bar. His application to take the February 1981 North Carolina Bar Examination was denied by the Board on the basis that he had failed to demonstrate his good moral character. The applicant filed his written application to take the Bar examination in November 1980. On 29 January 1981, a panel of the

Board, after notifying Elkins, held a hearing concerning his character and subsequently denied his application.

Elkins requested a *de novo* hearing before the full Board. He was allowed to take the Bar examination but was advised that the results would be sealed until the Board determined whether he was of good moral character. The applicant appeared with counsel at a formal hearing which was held before the full Board on 15 May 1981. On 21 August 1981, the Board made findings of fact and conclusions of law and issued an order denying Elkins' application to take the February 1981 Bar Examination and permanently sealing his results on the examination. This decision was based on the Board's conclusion that Elkins failed to satisfy the Board that he was of good moral character.

The applicant appealed the Board's decision to the Superior Court. Judge Battle ruled that the Board's findings of fact were not supported by substantial evidence and, even if they were supported by substantial evidence, they would be insufficient to rebut Elkins' *prima facie* showing of good moral character. Judge Battle ordered that Elkins be granted a law license if he passed the Bar examination. From this Judgment, the Board appeals to this Court pursuant to Section .1405 of the Rules Governing Admission to the Practice of Law promulgated under the authority granted in G.S. 84-24.

The focal point of the controversy in this case is an incident that occurred in Chapel Hill on 14 July 1975. The undisputed facts are as follows: Elkins was a student at the University of North Carolina at Chapel Hill and was working on an undergraduate honors thesis in sociology. He had lived in the same apartment for three years and, at the time of the incident, he shared the apartment with three roommates. During the afternoon of 14 July 1975, he arrived at his apartment from his parents' home in Winston-Salem. After his roommates left that evening he began to study, but after a short time he decided to enter the attic in his apartment. In order to do this he moved a dresser from one of the bedrooms into the hallway and stood on the dresser in order to lift himself through the hatch in the ceiling. The attic did not have a floor and there was blown insulation between the joists. The attic was not air-conditioned and the only light was a dim light from a side vent. The attic was undivided and covered both

Elkins' apartment and the apartment next to his which was rented to three females. The only entrance to the attic was from Elkins' apartment.

After viewing the attic Elkins went back into his apartment and then returned to the attic with his study materials, a flashlight, a 35 millimeter camera, a camera tripod and a brace with a quarter-inch bit. After a short time in the attic, he returned to his apartment and, using an electric drill and a keyhole saw, he created another entrance to the attic in the ceiling of the bathroom that adjoined his bedroom. He covered this opening with a piece of plywood and returned to the attic.

Elkins had been in the attic for several hours when he heard someone attempting to enter the attic. He turned off his flashlight and hid behind a duct. At this point the attic was completely dark. He saw someone look in and search the attic with a flashlight. Elkins then drilled several holes from the attic through the ceiling of the women's apartment. Through these holes and through an exhaust fan vent from the bathroom, it was possible to see from the attic into the bathrooms and bedroom of the apartment rented to the three women.

The Chapel Hill police were called by the women who occupied the apartment and Elkins was arrested and charged with illegal entry and secretly peeping into a room occupied by a female person. He was tried on these charges upon his plea of not guilty and was convicted in Orange County District Court. The court entered a prayer for judgment continued and a fine of $50.00. A subsequent civil suit for invasion of privacy brought against Elkins by two of the women who lived in the apartment ended in a directed verdict for Elkins at the close of the plaintiffs' evidence.

The remainder of the evidence brought out in the hearing related to matters which were disputed. Elkins maintained that he entered the attic for the purpose of studying and that he took the camera, tripod, brace and bit into the attic as diversions during his studying. He testified that he intended to clean the camera because it had sand in the mechanism from an earlier trip to the beach. He planned to drill holes in the leg of the tripod in order to attach a carrying strap. He testified that he had no intent to secretly peep on the women in the adjoining apartment

and that he did not know that the attic covered both apartments. He hid in the attic when he heard someone attempting to enter the apartment because he thought it was either a prowler or one of his roommates who would ridicule him for studying in the attic. He drilled the holes because he was dazed and confused and thought the holes would provide ventilation and an opportunity to see if there was a prowler in the apartment below. He believed that he was drilling through the ceiling over his own apartment.

The Board found that Elkins entered the attic and drilled the holes for the purpose of secretly peeping into the bathrooms and a bedroom of the adjoining apartment and that he took his camera into the attic with the specific intent of photographing the female occupants of the adjoining apartment. The Board also found that Elkins' answers to the interrogatories in the prior civil suit and his testimony under oath before the Board were untrue and given by him with the intent to deceive the court in that prior action and the Board. The Board then concluded that Elkins' actions on 14 July 1975 and his subsequent false testimony before the Board and untrue statements in his answer to the interrogatories in the civil suit rebutted his *prima facie* showing of good moral character. The Board further concluded that, even if Elkins' prior acts of misconduct were not dispositive of his character determination, the false statements and testimony before the Board demonstrated the applicant's present lack of good moral character.

[1, 2] We have previously outlined the procedure used by this Court in reviewing decisions of the Board. *In re Moore*, 301 N.C. 634, 272 S.E. 2d 826 (1981); *In re Rogers*, 297 N.C. 48, 253 S.E. 2d 912 (1979). The findings and conclusions of the Board are judicially reviewed under a "whole record" test to determine if they are supported by "substantial evidence." The applicant has the initial burden of proving his good character. If the Board relies on specific acts of misconduct to rebut this *prima facie* showing, and such acts are denied by the applicant, then the Board must establish the specific acts by the greater weight of the evidence.

It is the function of the Board to resolve factual disputes. *In re Rogers*, 297 N.C. 48, 253 S.E. 2d 912 (1979). The reviewing court must take into account whatever evidence in the record detracts from the Board's decision as well as that which supports

the decision, but the reviewing court is not allowed "to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo.*" *Thompson v. Board of Education,* 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977); *see also Baker v. Varser,* 240 N.C. 260, 82 S.E. 2d 90 (1954).

In the present case, the Board made findings of fact as required by this Court in the case of *In re Rogers,* 297 N.C. 48, 253 S.E. 2d 912 (1979). The basis for the Board's denial of Elkins' application is, in some ways, similar to the rationale used by the Board in the case of *In re Moore,* 301 N.C. 634, 272 S.E. 2d 826 (1981). Specifically, in both cases the Board found that the applicant made false statements under oath. In reversing the Superior Court's affirmation of the Board's order, we held in *Moore* that the findings of fact were not complete as they did not include a finding that the applicant's omissions were purposeful and done with the intent to mislead the Board. We also held that the Board had made judicial review impossible in that case by failing to specifically identify the statements which it concluded were false. Finally, we stated that,

> [t]he Board should not conduct a hearing to consider applicant's alleged commission of specific acts of misconduct and *without a finding that he committed the prior acts* use his denial that he committed them as substantive evidence of his lack of moral character. The Board should first determine whether in fact the applicant committed the prior acts of misconduct.

*Id.* at 641, 272 S.E. 2d at 831 (emphasis in original).

The Board in the present case followed the directive of *Moore* and specified which statements made by Elkins it considered to be false, found that Elkins made the statements with the intent to deceive the Board and also made findings that Elkins committed the prior acts of misconduct. These findings were used, in addition to the Board's use of his denial that he committed the acts, as substantive evidence of his lack of good moral character.

The Board's findings were primarily based on Elkins' testimony, testimony of his character witnesses, his answers to inter-

rogatories in the prior civil suit and his related convictions in Orange County District Court. The applicant first contends that the Board erred by using evidence of his criminal convictions in this civil matter. We disagree.

**[3]** We note the general rule that in a civil action for damages evidence of a criminal conviction is not admissible. *Tidwell v. Booker,* 290 N.C. 98, 225 S.E. 2d 816 (1976). However, the rules of evidence before an administrative board permit more latitude than is allowed in court proceedings. *Campbell v. Board of Alcoholic Control,* 263 N.C. 224, 139 S.E. 2d 197 (1964). A detailed exploration of the reasons for the differences between hearings before an administrative board and court proceedings is unnecessary. It suffices to say that evidence of criminal convictions has long been properly admitted and considered in hearings before boards of law examiners in this and other jurisdictions to determine an applicant's moral character. *In re Moore,* 301 N.C. 634, 272 S.E. 2d 826 (1981); *In re Applicants for License,* 191 N.C. 235, 131 S.E. 661 (1926); *In re Dillingham,* 188 N.C. 162, 124 S.E. 130 (1924); 7 Am. Jur. 2d, *Attorneys at Law* § 16 (1980); Annot., 88 A.L.R. 3d 192 (1978). Evidence of a criminal conviction is not conclusive evidence of the applicant's lack of good moral character, but it is some evidence that can be considered by the Board. The Board's use of the applicant's criminal convictions as evidence in the present case was not error.

**[4]** We next consider whether the Board's findings were supported by substantial competent evidence. We are satisfied from the record before us that they were. Elkins' testimony was internally inconsistent in many respects. Also, there were numerous contradictions and inconsistencies between Elkins' testimony and the other evidence presented from which the Board could conclude that Elkins was testifying falsely with the intent to deceive the Board.

Elkins testified that he entered the attic to study and because he was interested in attics and in the construction of the roof of the apartment. He testified that he was familiar with attics and building construction and that he initially looked in the attic to learn more about its construction. Yet he also testified that, although he was in the attic at least four hours, it never occurred to him that the attic was undivided and covered the apart-

ment next door as well as his own apartment. In other words, despite the fact that he was acquainted with attics and was specifically observing the attic construction, he did not realize that the attic was twice as large as his apartment.

Elkins testified that he entered the attic for the first time in the three years that he had been living in the apartment because he was bored and was having difficulty maintaining his concentration while studying. He had never studied by a flashlight or in an attic before nor has he done so since. He wanted a change of scenery from his bedroom, despite the fact that he had just returned from spending ten days in Winston-Salem. He stated that there was no comfortable way to study in the living room or dining room of his apartment. Therefore, in the middle of July, he climbed from an air-conditioned apartment into an attic that had very little ventilation. Even though he was wearing only shorts and a tee shirt, he decided to study by flashlight while sitting on boards in an attic without a floor and with blown insulation between the joists.

Although Elkins testified that he entered the attic because he was having problems concentrating on his studying, he brought certain "diversions" with him. These included an aluminum tripod in which he planned to drill holes for a carrying strap. This was a project he had failed to begin for weeks but one he thought he would finally accomplish in July in a dark attic by flashlight. He decided not to use the electric drill in the apartment to accomplish this task in part because he "sometimes [does] things the hard way."

In addition to the tripod and brace, he brought his camera with him into the attic. He testified that, although the camera was loaded with film, he planned to work on it in the attic because he had taken it to the beach three weeks earlier and it had sand in the lens and winding mechanism. He was afraid the sand would "freeze" the camera movement. Therefore, he thought that a proper diversion from his studies would be to attempt to remove the fine particles of sand from the delicate mechanism of the camera by the light of a flashlight while sitting on a board in a dark attic and surrounded by blown insulation.

One of the significant acts by Elkins on 14 July 1975 was the cutting of the hole in the ceiling of his bathroom. The apartment

had two bathrooms and one entered only into Elkins' bedroom. Elkins testified that he initially entered the attic through the hatch in the ceiling of the hallway. He did this by pulling a dresser from one of the bedrooms into the hallway and climbing from the dresser through the hatch in the ceiling. Despite his intention to study and his several "diversions," he became bored after fifteen to twenty minutes and decided to create a new opening into the attic. He stated that at the time he cut the hole he did not necessarily plan to use the new opening or to study in the attic at any time in the future. After he cut the new entrance from his bathroom he covered the hole with a makeshift hatch. He testified that he never used this opening to enter the attic.

Certain facts cast doubt upon Elkins' claim that he did not use the newly created entrance and the Board found that his testimony in this regard was untrue and was given by him with the intent to deceive the Board. While Elkins was in the attic, the original opening was found covered and the dresser in the hallway was pushed back against the wall away from the opening. Evidence produced at the hearing also tended to show that the door to his bathroom containing the newly constructed entrance to the attic was found locked from the inside. Elkins testified that he did not lock the door.

One of the most significant acts by Elkins was the drilling of the holes. Elkins maintained that the holes were randomly drilled through the ceiling of the women's apartment while he was in a dazed state from being in the attic for several hours in July. Elkins' testimony was that while he was in the attic he heard someone attempting to enter the attic and he hid. His first thought was that the person was one of his roommates and he did not want to be discovered. He moved further away from the attic entrance as the person returned several times and scanned the attic with a flashlight. Elkins testified that he drilled the holes because he was hot and the air was stuffy. He thought the holes would provide some ventilation. He also thought that he might be able to tell if the person below was an intruder rather than one of his roommates. He testified that he drilled the holes slowly with the brace so as not to alert the person below. When questioned by the Board as to whether the droppings from the holes would be detectable and therefore alert the intruder to his presence, Elkins testified that, since the person had been looking in the at-

tic, he assumed the person was already aware of his presence and could not find him in the attic.

Elkins' fear that a prowler might have been in the apartment was omitted from his answers to the interrogatories in the civil suit. He explained this by pointing out that he hastily wrote those answers in three days, at least six months after the incident, and he did not include every detail.

His concern about the presence of an intruder was also omitted from the account he gave to his good friend and character witness, Grayson L. Reaves, Jr. Reaves testified that he talked for "quite some time . . . in detail" to Elkins about the events of 14 July 1975. He asked Elkins "some pretty serious questions and embarrassing questions" and felt as though he had "cross-examined" Elkins as to the incident, yet he was unaware that Elkins ever suspected that there was a prowler in the apartment.

One of the more striking aspects of the events of 14 July 1975 was the placement of the holes in the ceiling of the women's apartment. Elkins testified that the holes were drilled "randomly," although he moved once to a better hiding place after he had drilled the first hole. The evidence before the Board showed that the "random" holes were all located in the ceiling of the apartment of the women. In each of the two bathrooms in the women's apartment, holes were drilled over the shower and commode. There were also two holes drilled in the ceiling of one of the women's bedroom. The arresting officer testified that he could see from the attic into the rooms through the holes if he pushed back the insulation. He also stated that he did not think that a photograph could be taken through the holes, but that a photograph could be taken through the vent from the exhaust fan in each bathroom. The view through the vent was fairly clear and encompassed a large area of the bathroom including the shower and the commode.

From the foregoing it is clear that Elkins' testimony was replete with contradictions and inconsistencies. His actions as he described them were, in his own words, not "entirely reasonable." His account of the events of 14 July 1975 was inherently incredible. *See In re Gould,* 4 App. Div. 2d 174, 164 N.Y.S. 2d 48 (1957).

The applicant challenges the Board's ability to find that he gave false testimony. We have previously recognized the possibil-

ity that the Board, in some instances, may find that an applicant's testimony before it was false. In the recent case of *In re Moore*, 301 N.C. 634, 641 n. 3, 272 S.E. 2d 826, 831 n. 3 (1981), we noted:

> There may, however, be instances where the prior acts are not dispositive of the character determination; applicant's false statements about the acts then take on added significance. In either event the Board must prove the commission of the prior act and should first make a finding in regard thereto. It may then find, if it is so convinced, that the applicant testified falsely under oath.

The Board established by the greater weight of the evidence that Elkins committed the prior act. It then made findings of fact that Elkins testified falsely with the intent to deceive the Board. We hold that these findings were supported by the evidence previously summarized herein which was substantial evidence.

Having determined that the Board's findings were proper, we must determine if the findings are sufficient to rebut Elkins' *prima facie* showing of good moral character. The Board found that specific statements made by Elkins during his testimony under oath before the Board as well as his sworn responses to interrogatories in the civil suit were "untrue and were given by him with the intent to deceive the Court . . . [and] the Board." We have previously stated that: "[m]isrepresentations and evasive or misleading responses, which could obstruct full investigation into the moral character of a Bar applicant, are inconsistent with the truthfulness and candor required of a practicing attorney." *In re Willis*, 288 N.C. 1, 18, 215 S.E. 2d 771, 781, *appeal dismissed*, 423 U.S. 976, 46 L.Ed. 2d 300, 96 S.Ct. 389 (1975). Material false statements can be sufficient to show the applicant lacks the requisite character and general fitness for admission to the Bar. *In re Beasley*, 243 Ga. 134, 252 S.E. 2d 615 (1979); *Application of Walker*, 112 Ariz. 134, 539 P. 2d 891 (1975), *cert. denied*, 424 U.S. 956, 47 L.Ed. 2d 363, 96 S.Ct. 1433 (1976); *Greene v. Committee of Bar Examiners*, 93 Cal. Rptr. 24, 4 Cal. 3d 189, 480 P. 2d 976 (1971); *Petition of Bowen*, 84 Nev. 681, 447 P. 2d 658 (1968). We hold that the Board's findings of fact supported its conclusion that Elkins presently lacks such good moral character as to be entitled to take the February 1981 North Carolina Bar Examination.

In reaching this determination, it is unnecessary to decide "whether the Board should rely on a finding that an applicant lied under oath when the finding is based on *nothing more* than the applicant's denial of accusations against him." *In re Moore*, 301 N.C. 634, 641, 272 S.E. 2d 826, 830 (1981) (emphasis added). We emphasize that the present case involves much more than an applicant's mere protestation of his innocence of the act which he is accused of committing. The Board was presented with testimony that was internally inconsistent, intrinsically implausible and repeatedly contradicted by substantial evidence.

For the foregoing reasons, Judgment of the Superior Court is reversed and the case is remanded to the Superior Court, Wake County, with instructions to that Court to enter judgment affirming the order of the Board of Law Examiners.

Reversed and remanded.