IN THE MATTER OF: BASIL RAY LEGG, JR., APPLICANT TO THE FEBRUARY 1987 NORTH CAROLINA BAR EXAMINATION

No. 168A89

(Filed 7 December 1989)

1. **Constitutional Law § 23.4 (NCI3d); Attorneys at Law § 2 (NCI3d) — application to take North Carolina bar examination — lack of character and general fitness — no violation of due process**

    The Board of Law Examiners did not deny an applicant due process when it refused his petition to reopen or reconsider a case in order to present newly-discovered evidence where the applicant did not explain why the information could not have been presented to the Board at the time of the hearing; the Board did not abuse its discretion in refusing the applicant's petition to reopen the hearing to introduce testimony from his wife, who had had to leave the hearing early to pick up a child from day care; and there was no violation of due process in the fact that the de novo Board hearing included the two members of the original hearing panel.

    **Am Jur 2d, Attorneys at Law §§ 13, 20.**

2. **Attorneys at Law § 2 (NCI3d)— application to take bar examination — denied — findings supported by evidence**

The evidence in the whole record supported the Board of Law Examiners' findings that an applicant willfully converted funds owed a private investigator; that omissions from his application were more than inadvertent errors as the applicant suggested during his hearing; and that the applicant's practice of law in West Virginia had demonstrated a pattern of carelessness, neglect, and inattention to detail.

**Am Jur 2d, Attorneys at Law §§ 15, 16.**

3. **Attorneys at Law § 2 (NCI3d)— denial of application to take bar exam — conclusion that applicant lacked moral character and fitness — no error**

The Board of Law Examiners did not err by concluding that an applicant to take the North Carolina bar examination lacked the moral character and fitness required for licensing where the record reveals that the applicant failed to show the maturity and discipline that is a fundamental attribute of the good moral character required to practice law in North Carolina and, when the findings are viewed in the aggregate, they reveal a systemic pattern of careless neglect, inattention to detail, and lack of candor that permeates the applicant's character and could seriously undermine public confidence and the integrity of the courts.

**Am Jur 2d, Attorneys at Law §§ 15, 16.**

Justice WEBB dissenting.

Justice MITCHELL joins in the dissent.

ON appeal as of right pursuant to Rule .1405 of the Rules Governing Admission to the Practice of Law in the State of North Carolina from an order of *Brewer, J.,* entered 13 December 1988 in Superior Court, WAKE County, which affirmed the 16 June 1988 order of the Board of Law Examiners denying the applicant's application for admission to the North Carolina Bar Examination. Heard in the Supreme Court 12 October 1989.

**IN RE LEGG**

[325 N.C. 658 (1989)]

*Erdman, Boggs & Harkins, by Harry H. Harkins, Jr., for applicant-appellant.*

*Lacy H. Thornburg, Attorney General, by John F. Maddrey, Assistant Attorney General, for the Board of Law Examiners of the State of North Carolina-appellee.*

MEYER, Justice.

The applicant contests the conclusion of the North Carolina Board of Law Examiners (Board) that he had "not satisfied the Board that he possesses the qualifications of character and general fitness requisite for an attorney and counsellor at law and that he is of such good moral character as to be entitled to the high regard and confidence of the public" and that "[f]or this reason, his application to take the North Carolina Bar Examination should be denied." After examination of the whole record, we affirm the Board's conclusion.

The Board made this conclusion after the Superior Court remanded an earlier Board order dated 30 July 1987. In the 30 July 1987 order the Board affirmed the order of a two-member hearing panel dated 17 April 1987 denying the application to stand for the North Carolina Bar Examination.

Basil Ray Legg, Jr., is an applicant for admission to the North Carolina Bar. He first applied to take the July 1986 North Carolina Bar Examination. However, he sent his application late, and the Board declined to grant his request to file a late application. The Board returned the application and registration fee at his request.

On 14 October 1986, the filing deadline for the February 1987 examination, Legg resubmitted the application he filed for the July 1986 examination. His updated application indicated that he had moved to North Carolina as of 1 October 1986, having purchased a home and taken employment in this state. On 1 December 1986 he filed an amendment providing zip codes and corrected addresses.

The Board permitted Legg to take the February 1987 examination but sealed the results pending a final determination of his fitness and character. At the time he submitted his application, Legg was a licensed attorney in West Virginia. Having graduated from the West Virginia University Law School in December 1983, he was admitted to practice in West Virginia pursuant to its diploma privilege, under which no bar examination is required.

## IN RE LEGG

[325 N.C. 658 (1989)]

By letter dated 24 March 1987, the Board notified the applicant that he was to appear before a hearing panel to answer questions as to his fitness and character. On 17 April 1987 Legg appeared before the two-member hearing panel. On that date, subsequent to the hearing, Legg submitted an amendment to his application listing the following debts: a $250.00 debt to West Virginia State Senator Odell Huffman; a $316.10 debt to Tom Moses, a private investigator; a $10,000 unsecured "disputed" debt to the estate of Mary Veneri; a $1,000 debt to MasterCard; and a $20,000 margin account secured by stocks and securities held by Merrill Lynch. He incurred the first three debts between mid-September and 1 November 1986 and the last two over "various" dates. None of these debts were listed on his original application although question 17(c) of the application requires applicants to "[l]ist all debts over $200, including student loans, and indicate [their] status." Question 17(d) requires the applicant to state whether "any one ever asserted a claim or demand against [the applicant], which has not been made the subject of any action or legal proceeding."

Legg also amended his answer to question 18, in which he had originally stated that he had never been involved personally in any suit. The April amendment disclosed an October 1985 suit to recover a debt in which Legg prevailed as the defendant. The amendment listed an additional malicious prosecution suit pending, with Legg and his wife the defendants. The amendment also listed a dispute regarding the estate of Mary Veneri, his mother-in-law, in which suit would be filed. Neither of the suits or the dispute were listed on his original application, although question 18 asks "[h]ave you ever been involved in any suits in equity, actions at law, suits in bankruptcy or other statutory proceedings, matters in probate, lunacy, guardianship, or any other judicial proceedings of any nature and kind, except criminal proceedings, personally or as a member of a professional association or corporation?"

Finally, the amendment listed his membership since May 1985 in two professional organizations. His original application indicated no membership in any professional organization, although question 37(b) requires applicants to "give the name and address of each organization whose membership consists primarily of attorneys and of which you are or have ever been a member."

By order dated 17 April 1987, the hearing panel concluded that Legg "has failed to satisfy the Hearing Panel that he possesses

the qualifications of character and general fitness requisite for an attorney and counsellor-at-law and is of such good moral character as to be entitled to the high regard and confidence of the public." On that basis the panel denied Legg's application and ordered that his February 1987 North Carolina Bar Examination be permanently sealed. Pursuant to Board Rule .1203(b), Legg requested a hearing *de novo* before the full Board.

The Board mailed a notice of hearing to the applicant and his attorney on 1 May 1987. The notice set out that specific inquiry would be made concerning three complaints filed with the West Virginia State Bar against the applicant, the five specific debts not listed on the original application, pending litigation involving the applicant, and the applicant's representation of Linda B. White of Princeton, West Virginia. The notice also stated that "[w]hile the Board will make specific inquiry about the matters referred to above, please be advised that inquiry can be made about the answers to any questions set out in the application." The notice also directed the applicant "to bring to this hearing any files, papers, statements of account, cancelled checks and any other documents he may have that relate to the matters of inquiry."

The hearing took place on 15 May 1987 before nine members of the eleven-member Board, including the two panel members who conducted the original hearing. On that day, prior to the hearing, Legg filed a third amendment to his application. This amendment described changes in his MasterCard and Merrill Lynch balances, a new automobile loan and the final satisfaction of a bank loan. The third amendment indicated for the first time a disputed $475.00 debt concerning a legal fee owed his nephew, Tony Veneri, which arose from a case in which the applicant and his nephew were co-counsel. The amendment also indicated for the first time a disputed amount owed to Richard Daisey, a court reporter. Like the previous two amendments, this third amendment was handwritten, though the form states that amendments should be typewritten.

The Board initially questioned the applicant regarding omissions in his answers to question 6 of the application. That question requires applicants to "[l]ist . . . every permanent and temporary residence you have ever had . . . since your 16th birthday." The question also required applicants to give the exact address of each residence.

Legg admitted that his response to the question was incomplete and that it should have included his Louisiana residence during the semester he withdrew from law school and lived with his fiancée. On his application Legg had listed the addresses of his residences during law school (September 1980 through December 1983) as "Various Apartments." He stated to the Board that he incompletely responded to the question because he was "unsure of the extent of the detail required on the application," that he just "assumed that this would be sufficient," that the omissions were "an oversight on [his] part" and that he "did not take the necessary care in filling out this section."

Legg also neglected to list in his response to question 12 a month's employment as a laborer following his graduation from college. He left that position without giving notice because he found the work "too strenuous" and "[a]t the age of 18 or 19 [he] was not disciplined enough to handle those responsibilities."

The Board questioned Legg about those debts omitted from his answer to question 17 in his original application which were the subject of his second amendment. Legg stated that his omission of those debts on the original application was "an oversight." Failure to include debts arising from his practice of law "was because [he] did not remember that part of the question when [he] updated and amended [his] application."

Legg "simply did not think of" the debt due Senator Huffman for the last month's rent on his law office when he submitted his application. Legg testified that he believed he had an understanding with the Senator in which Legg would return to retrieve some telephone equipment and pay the outstanding rent at that time since Huffman "never sent me a bill." After the two-member panel investigated the matter at the hearing, Legg sent the Senator a check in full payment. Legg introduced a letter from Senator Huffman in which Huffman indicated that on 1 May 1987 he had received the balance due on the office rental.

Legg stated that when he filed his October application he had no knowledge of his debt to Tom Moses, the private investigator. Under the West Virginia indigent defense system, the attorney is responsible for paying certain case-related expenses such as court reporting and private investigation. Legg's practice had been to pay for services prior to state reimbursement or, alternatively, after reimbursement. When Legg closed the approximately seventy

active files for which he needed to bill the state prior to his move to North Carolina, he attached to his claim for reimbursement two separate invoices from Moses.

Legg testified that he did not pay Moses from the lump-sum reimbursement checks he received from West Virginia because the checks did not specify which cases they were for or whether they included monies for expenses incurred. He stated that because of pressing family matters, he did not have the time to appropriately keep track of funds owed Moses from two of these approximately seventy files. Legg deposited the reimbursements in his personal account. Because he did not have a "current bill" from Moses, there was nothing "in front of [him] to alert [him]" to the debt to Moses. Legg began paying Moses in installments only after Moses sent a follow-up bill. Legg did not volunteer the matter of this or any other debt to the two-member hearing panel because he did not think that he could file additional amendments once he had taken the Bar examination.

Attached to the same claims for reimbursement as the Moses invoices were invoices for Tichenor Court Reporting Services. At the Board hearing Legg was questioned for the first time about possible outstanding debts relating to these services. Legg testified that he had no occasion to look into his files to determine whether these particular bills remained unpaid. Because he had received no further billings from Tichenor, he was under the impression that he had paid for these services completely. Legg indicated that he did not feel the need to go back through his nearly three hundred files to see if any outstanding problems like those with Mr. Moses existed. Legg suggested that if he owed money to Tichenor it might be the reporting service's fault for not having billed him promptly.

Legg testified that the alleged $10,000 debt to the Veneri estate arose after Legg privately approached Mrs. Veneri, his mother-in-law, for an unsecured loan to make a down payment on a North Carolina house. Mrs. Veneri had loaned him a similar amount some time earlier, which he had repaid. Unlike the earlier loan, there was no promissory note representing the later indebtedness. Legg testified that Mrs. Veneri gave him a cashier's check for the amount of the loan in September 1986, immediately prior to her demise. She requested at the time she gave him the money that he not tell her sons about it because they would think she was showing

favoritism towards her daughter, Legg's wife. When Mrs. Veneri died, Legg said he felt himself bound by his promise to his dead mother-in-law not to disclose the existence of the debt to his brother-in-law, Randall Veneri, the executor of the estate.

Upon discovery of the disbursement, the executor demanded that Legg and his wife sign a statement acknowledging an indebtedness of $10,000 to the estate to be treated as an advancement. The Leggs signed such a statement on 18 September 1986. Legg stated at the hearing that this matter did not cross his mind when he filed his application a month later. He disputed owing anything to the Veneri estate and failed to list this as a debt because the executor treated it as an advancement.

Legg recognized that though the $20,000 debt to Merrill Lynch was technically and legally a debt, he viewed it as a "bookkeeping tool" since it was fully secured with securities. The revolving consumer debt due MasterCard may not have been over $200.00 when he updated his application, but he acknowledged that it may have increased at the time of the two-member panel hearing. He listed the alleged debt to Tony Veneri because his counsel "helped [him] to see that [he] need[s] to look very broadly at what a possible debt could be." Legg explained his omissions as being due to the fact that he interpreted question 17(c) to include only installment debt. Although he "did not keep up with [his] updating of the application as [he] should have," Legg stated he "was concerned with accuracy" when he filled out this portion of the application.

Legg opined that his troubles with the Board were the direct result of an effort by his wife's family to bring discredit upon him. This effort was occasioned by disputes arising over the settlement of the estate of his wife's mother.

Legg neglected to list a 1985 suit by his optometrist to recover a debt. Since he won the case, Legg indicated that he had no reason not to disclose the matter. Question 18 requires applicants to list all suits in which there was personal involvement. The question further requires applicants to furnish "copies of the litigation — bankruptcy, judgments, small claims, etc." The record on appeal does not contain such copies from the 1985 suit.

The Board next questioned Legg regarding his representation of Linda B. White during the course of his West Virginia practice. Legg's representation of Linda White concerned a suit for child

IN RE LEGG

[325 N.C. 658 (1989)]

support. After judgment in the case, Mrs. White wrote Legg a letter dated 10 June 1986 requesting that he return the contents of her file. He did so on 28 April 1987 following questioning about the matter during the two-member panel hearing. Legg explained that all the White papers were public records readily available at the courthouse in West Virginia and were not necessary for Mrs. White to prosecute her case further.

Legg next testified about three informal complaints filed with the West Virginia Bar which arose during the eighteen months Legg practiced law. West Virginia reviewers dismissed all three complaints. Legg dismissed as "meaningless dicta" which "disgusted" him a conclusion of law by the West Virginia investigator in one of those matters (the Long matter) that the client's "dissatisfaction with the rate at which Mr. Legg pursued the case alleges, at best, an isolated instance of neglect over which the Committee has no jurisdiction."

Legg offered into evidence seventeen additional certificates of his moral character. He testified that he had never been accused of a breach of trust. He pointed out that when he filed his application for the July 1986 Bar it was correct as to debts.

He admitted that he had been extremely careless in filling out his application to take the February 1987 Bar. He further explained the omissions as human error and lack of maturity. He testified that he "must show more discipline in [his] professional matters" and stated that the first thing he would do if he ever started practicing law again would be to hire an experienced secretary. Legg was the only witness at his hearing.

By order dated 30 July 1987 the Board made findings of fact and concluded that the applicant did not possess the moral character requisite for licensure as an attorney of the North Carolina State Bar. Legg filed a petition for rehearing pursuant to Board Rule .1206. The Board denied the petition. Applicant filed exceptions to the Board's orders pursuant to Board Rule .1401 and appealed to the Superior Court of Wake County. By order dated 24 March 1988 Superior Court Judge D. Marsh McLelland remanded the case to the Board for further proceedings pursuant to Board Rule .1404.

On remand the Board relied on the record already before it. In its new findings of fact, the Board found that each of the appli-

cant's answers to questions 6, 12, 17(c) and 18 "displayed a lack of fairness and candor in dealing with the Board." The Board specifically rejected the applicant's explanation that each and every failure to fully disclose information specifically required by the application was the result of inadvertence. The Board found that "the Applicant purposefully failed to disclose numerous significant matters, and conclude[d] that the effect of these omissions was to mislead and deceive the Board." In making this finding the Board placed greatest weight on the failure to list: the debts to Huffman and Moses; the disputed debt to the Veneri estate; and the applicant's involvement as a defendant in the 1985 action to recover a debt.

The Board found further that the applicant demonstrated a "pattern of carelessness, neglect, and inattention to detail" while engaged in the practice of law in West Virginia. The Board found that he was "presently morally unfit to practice law in the State of North Carolina because of his failure to settle all accounts left owing from his law practice, his willful conversion of funds owed to a private investigator . . . and his neglect to return legal papers to a client after a written request for such papers."

The Board again concluded that "[t]he Applicant has not satisfied the Board that he possesses the qualifications of character and general fitness requisite for an attorney and counsellor at law and that he is of such good moral character as to be entitled to the high regard and confidence of the public." It again denied Legg's application by order dated 16 June 1988.

Legg filed exceptions to the Board's order and appealed to the Superior Court. Judge Coy E. Brewer, Jr., heard the matter at the 6 September 1988 Civil Non-jury Session of Superior Court, Wake County, and, by order dated 13 December 1988, affirmed the order of the Board.

Applicant assigns as error the conclusion by the Board that he "has not satisfied the Board that he possesses the qualifications of character and general fitness requisite for an attorney and counsellor at law and that he is of such good moral character as to be entitled to the high regard and confidence of the public." More specifically, applicant assigns as error the findings of the Board that he willfully converted funds owed to Moses; that his application omissions were purposeful; that he attempted to conceal the Veneri loan; and that a pattern of carelessness, neglect and

inattention to detail characterized his West Virginia practice. Additionally, applicant asserts that the Board denied him due process when it refused to permit him to present additional evidence after the hearing by denying his petition for rehearing. He also asserts the *de novo* board hearing did not comport with due process since the hearing included the two panel members who originally denied his application.

[1]   We address first the due process claims. Legg claims that the Board denied him due process when it refused his petition to rehear the case. Board Rule .1207 provides that an applicant may petition the Board to reopen or reconsider a case in order to present "newly discovered evidence which was not presented at the initial hearing because of some justifiable, excusable or unavoidable circumstances." Legg sought to admit a letter from Mr. Moses stating that the investigator had "nothing but positive comments for Mr. Legg." The notice Legg received from the Board stated that he would be questioned about his "indebtedness to Tom Moses of Princeton, West Virginia and why this was not reported on applicant's application." Applicant fails to explain why, given full and fair notice such as occurred here, this information could not have been presented to the Board at the time of the board hearing.

Legg also sought reopening in order to introduce testimony from his wife concerning the Veneri loan. His basis for reopening the hearing was that the hearing began one and a half hours late and Mrs. Legg left the hearing without having testified, in order to pick up a child from day care. Again, the notice of hearing specifically identified the Veneri loan as a matter of inquiry. While we do not know what Mrs. Legg's testimony would have been, plaintiff does not contend that its content was newly discovered evidence but rather argues that its exclusion demonstrates arbitrariness in the Board's refusal to reopen the case. We find that the Board did not abuse its discretion in refusing the applicant's petition for rehearing.

We find no violation of due process in the fact that the *de novo* board hearing included the two members of the original hearing panel. We note as an initial matter that the applicant made no motion at the board hearing seeking recusal of the two panel hearing members. Nor has the applicant made a showing of actual prejudice. This situation is analogous to an *en banc* hearing before

**IN RE LEGG**

[325 N.C. 658 (1989)]

a federal appeals court after a case has been decided by a panel of the court's judges. There is no due process consideration when the same trial judge retries the same issues on remand after reversal of his decision by an appellate court. *See FTC v. Cement Institute,* 333 U.S. 683, 702-03, 92 L. Ed. 1010, 1035, *reh'g denied,* 334 U.S. 839, 92 L. Ed. 1764 (1948). The United States Supreme Court heard and rejected this theme in an analogous situation. *Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712 (1975) (investigating members of state medical board may issue probable cause finding and later participate in contested hearing to determine whether to suspend a physician's license temporarily). We find no error in this administrative procedure.

[2] We turn now to the Board's findings of fact and conclusion of law. This Court employs the whole record test when reviewing decisions of the Board of Law Examiners. Under this test, there must be substantial evidence that supports the Board's findings of fact and conclusions of law. Substantial evidence means that relevant evidence which a reasonable mind could accept as adequate to support a conclusion. *In re Moore,* 308 N.C. 771, 779, 303 S.E.2d 810, 815-16 (1983). "Under the 'whole record' test we must review all the evidence, that which supports as well as that which detracts from the Board's findings, and determine whether a reasonable mind, not necessarily our own, could reach the same conclusions and make the same findings as did the Board." *Id.* at 779, 303 S.E.2d at 816. The initial burden of showing good character rests with the applicant. "If the Board relies on specific acts of misconduct to rebut this *prima facie* showing, and such acts are denied by the applicant, then the Board must establish the specific acts by the greater weight of the evidence." *In re Elkins,* 308 N.C. 317, 321, 302 S.E.2d 215, 217, *cert. denied,* 464 U.S. 995, 78 L. Ed. 2d 685 (1983).

There is uncontroverted evidence in the record before us to support the Board's finding that Legg willfully converted funds owed investigator Moses. "Conversion is 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.' " *Wall v. Colvard, Inc.,* 268 N.C. 43, 49, 149 S.E.2d 559, 564 (1966) (quoting *Peed v. Burleson's, Inc.,* 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) ). The applicant intentionally deposited checks received from the State of West Virginia into his personal checking account and spent those funds

IN RE LEGG

[325 N.C. 658 (1989)]

for his personal account. These funds were paid in reimbursement for expenses incurred in the defense of West Virginia indigents. The evidence showed that Legg had an obligation to forward a portion of these funds to investigator Moses. Legg's conduct shows an unauthorized assumption of the right of ownership over monies to which another was entitled sufficient to support the Board's conclusion in the context of a Board hearing.

Legg argues that he mistakenly spent the money owed to Moses under an erroneous belief that there were no bills outstanding. While the conversion did not necessarily rise to the level of a criminal offense or civil liability, such an evidentiary showing is not necessary in a Board proceeding to determine an applicant's moral fitness to practice law in North Carolina. *See Campbell v. Board of Alcoholic Control*, 263 N.C. 224, 225, 139 S.E.2d 197, 198-99 (1964), *cited in In re Elkins*, 308 N.C. at 323, 302 S.E.2d at 218.

Furthermore, Legg misinterprets the Board finding as requiring that attorneys deposit reimbursement checks in a client trust account. This is not the case. Rather, implicit in the Board finding is the underlying premise that Legg had a duty to ensure that debts associated with the reimbursement claims were paid in full before putting the reimbursement monies to his own use. This position is a reasonable one.

The evidence also supports the Board findings that the omissions from the application were more than inadvertent errors as the applicant suggested during his hearing. Legg told the Board that to him " 'debt' means a confirmed obligation to repay money." He admitted that in spite of this he did not reveal the $250.00 owed Huffman, the $316.10 owed Moses or the $10,000 claimed by the estate of Mary Veneri until after notification by the hearing panel of its interest in these matters.

Applicant asserts that without supporting evidence the Board may not reject his excuses of inadvertence to conclude that he was deceitful. The Board found that there was "a pattern of failing to disclose material matters specifically required to be disclosed" such that "the *effect* of these omissions was to mislead and deceive." (Emphasis added.) The basis of the Board's finding was the failure to list all addresses, places of employment, debts and actions in which applicant had been a party. The Board placed the greatest weight on the applicant's failure to list his debts and the action to which he had been a party.

## IN RE LEGG

[325 N.C. 658 (1989)]

A material omission from a Bar application is "one that 'has the effect of inhibiting the efforts of the bar to determine an applicant's fitness to practice law.'" *Attorney Grievance Commission v. Gilbert*, 307 Md. 481, 492, 515 A.2d 454, 459 (1986) (quoting *Matter of Howe*, 257 N.W.2d 420, 422 (N.D. 1977) ). Like misrepresentations, evasive responses and misleading statements, a purposeful pattern of failing to disclose material matters required to be disclosed can "obstruct full investigation into the moral character of a Bar applicant, [and is] inconsistent with the truthfulness and candor required of a practicing attorney." *In re Willis*, 288 N.C. 1, 18, 215 S.E.2d 771, 781, *appeal denied*, 423 U.S. 976, 46 L. Ed. 2d 300 (1975). *See generally* Annot., "Falsehood, Misrepresentations, Impersonations, and Other Irresponsible Conduct as Bearing on Requisite Good Moral Character for Admission to Bar," 30 A.L.R. 4th 1020 § 23[b] (1984).

Personal indebtedness required to be disclosed on a Bar application is a material matter requiring full disclosure. *Re Application of Lumpkin*, 251 Ga. 64, 302 S.E.2d 679 (1983) (per curiam). Legg admits he failed to make full disclosure. When the admitted omission of a prior legal action in which nonpayment of a debt was the central issue is added to Legg's admission of his failure to make full disclosure of his personal indebtedness, it is clear by the greater weight of the evidence that there was a pattern to Legg's omissions which would support a finding that the failure to disclose was purposeful. The Board could certainly conclude that the effect of these omissions was to mislead and deceive.

In his third assignment of error the applicant asserts that the Board erroneously found he attempted to conceal the existence of a $10,000 loan from the executor of the Veneri estate. Legg admitted that he did not tell the executor about the loan until confronted personally about it. He excused this behavior as being guided by a promise to his deceased mother-in-law. "It is well settled that the credibility of witnesses and the probative value of particular testimony are for the administrative body to determine . . . ." *State ex rel. Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 21, 287 S.E.2d 786, 798 (1982). The Board committed no error in making this finding.

Nor did the Board commit error when it found that Legg's practice of law in West Virginia "demonstrated a pattern of carelessness, neglect, and inattention to detail." The applicant does

not challenge the underlying evidence which forms the basis of this finding. Instead, he would have us adopt his interpretation of the events surrounding his practice since the West Virginia State Bar never admonished him. The standards relevant to an admonishment by the West Virginia Bar do not determine whether applicant's practice is characterized by a pattern of carelessness and neglect. We hold that the greater weight of the evidence supports the Board finding that such a pattern existed.

[3] As a result of these and other findings not excepted to, the Board concluded that the applicant lacked the moral character and fitness required for licensing. Applicant asserts that this conclusion was also erroneous.

Initially, the burden is on the applicant to prove his good moral character because "[f]acts relevant to the proof of his good moral character are largely within the knowledge of the applicant and are more accessible to him than to an investigative board." *In re Willis*, 288 N.C. at 15, 215 S.E.2d at 780. If evidence of an applicant's omissions becomes apparent, the Board should first determine if the applicant made the omissions purposefully. If the Board determines that the omissions were purposeful, the Board must then decide whether the omissions "so reflect on the applicant's character that they are sufficient to rebut his prima facie showing of good character." *In re Moore*, 301 N.C. 634, 641, 272 S.E.2d 826, 831 (1981).

"[A state] has wide freedom to gauge on a case-by-case basis the fitness of an applicant to practice law." *In re Griffiths*, 413 U.S. 717, 725, 37 L. Ed. 2d 910, 917 (1973). The character requisite for an applicant to the Bar "is something more than an absence of bad character." *In re Applicants for License*, 191 N.C. 235, 238, 131 S.E. 661, 663 (1926). "Material false statements can be sufficient to show the applicant lacks the requisite character and general fitness for admission to the Bar." *In re Elkins*, 308 N.C. at 327, 302 S.E.2d at 221. "Good moral character has many attributes, but none are more important than honesty and candor." *In re Green*, 464 A.2d 881, 885 (Del. 1983) (per curiam). Where there is a purposeful pattern of omitted material information, the Board may conclude that the applicant has failed in his burden to exhibit candor in his application.

"[T]he prime obligation and responsibility of both the Board and this Court [are] to protect the public from incompetent and

**IN RE LEGG**

[325 N.C. 658 (1989)]

dishonest lawyers, and to assure that those admitted to the Bar possess the requisite attributes of good moral character, learning and ability." *Id.* "The purpose of withholding certifications is not to punish the candidate but to protect the public and preserve the integrity of the Courts." *In re Jenkins*, 94 N.J. 458, 470, 467 A.2d 1084, 1090 (1983). We would add that fundamental attributes of good moral character include the maturity and professional discipline necessary to accept responsibility and perfect the actions required to represent a client properly.

Legg stated in his hearing that because of an unexpectedly early departure from West Virginia, he "did not have the time to appropriately keep track of funds owed Mr. Moses." We note that despite his haste the applicant did have the time to fully bill the Public Service Corporation of West Virginia. Only after the Board made specific inquiry into this and other matters was the applicant forthcoming. But for the Board, it would seem that some debts the applicant paid would remain yet unpaid and Linda White would await yet the contents of her file. The applicant's practices did not inspire the confidence of the Board and would not be likely to inspire the confidence of the general public.

The record and application indicate that Legg exhibited at best an attitude of carelessness and inattention to detail in his practice and his application. Such work habits could prove permanently damaging to any client who might come to rely upon the applicant's professional expertise. Our review of the record reveals no evidence that the applicant accepts personal responsibility for any of the numerous oversights, mistakes and inaccuracies that litter his application and the history of his practice in West Virginia. An applicant who fails to exhibit care in the submission of a document essential to his admission to the practice of his chosen career is unlikely to exhibit any greater degree of care during the course of client representation. In short, the record reveals that Legg fails to show the maturity and professional discipline that is a fundamental attribute of the good moral character required to practice law in this state.

The findings taken singly may not be sufficient to disqualify the applicant from the practice of law in North Carolina. *See In re Rogers*, 297 N.C. 48, 58, 253 S.E.2d 912, 918 (1979) ("Whether a person is of good moral character is seldom subject to proof by reference to one or two incidents"). However, when the findings

IN RE LEGG

[325 N.C. 658 (1989)]

are viewed in the aggregate, they reveal a systemic pattern of carelessness, neglect, inattention to detail and lack of candor that permeates the applicant's character and could seriously undermine public confidence and the integrity of the courts. The Board committed no error by concluding that the applicant has failed to satisfy the Board that he possesses the qualifications of character and general fitness requisite for an attorney and counsellor at law and that he is of such good moral character as to be entitled to the high regard and confidence of the public.

Affirmed.

Justice WEBB dissenting.

I dissent. The Board of Law Examiners has denied the appellant the right to be admitted to the bar in this State. The Board based this decision on the following finding:

> Applicant has failed to satisfy the Board that he possesses the qualifications of character and general fitness requisite for an attorney and counselor at law and that he is of such good moral character as to be entitled to the high regard and confidence of the public.

This conclusion of the Board was based on the way the appellant answered certain questions on the application to take the bar examination in this state and on a finding as to how he practiced law in West Virginia. The appellant did not list on his application all his prior residences, two jobs at which he worked, a debt in the amount of $250.00 owed for rent on an office he had used in West Virginia, a debt in the amount of $316.00 to a private investigator in West Virginia, and a loan from the appellant's mother-in-law in the amount of $10,000.00. The appellant also failed to list an action which had been filed against him in a magistrate's court in West Virginia, which action was dismissed. In addition he had represented a woman in West Virginia and obtained a judgment for her. She requested on 10 June 1986 that he deliver to her the legal papers in that action and he did not do so until 28 April 1987.

The appellant appeared before a panel of the Board on 17 April 1987 and the full Board on 15 May 1987. He explained that he had resubmitted the same application to take the February 1987 bar examination as he had submitted for the 1986 examination.

**IN RE LEGG**

[325 N.C. 658 (1989)]

In the process he had forgotten that debts of more than $200.00 had to be listed. For this reason he did not list the debts for rent or to the private investigator. When he closed his law office he billed the State of West Virginia for work he had done for indigent defendants, which included the bill for the private investigator's work. He received checks for this work after he had moved to North Carolina and the checks did not show that any part of them were for the private investigator. He deposited the checks to his account in this state and when it was called to his attention that he owed the private investigator he made arrangements to pay it. When it was called to his attention that he owed rent in West Virginia he paid this.

The applicant testified that he inadvertently left off his application his former residences and his places of employment. He testified he did not intend to deceive the Board. As to the $10,000.00 debt to his mother-in-law, the appellant testified that she lent this money to him and his wife to help them buy a home in North Carolina. His mother-in-law asked him not to tell her other children as they would feel she was favoring his wife. After the death of the mother-in-law, his wife's brother confronted him in regard to the loan and he admitted it. He and his wife had signed a paper which said the loan would be treated by his wife as an advancement from her mother's estate and he did not consider it a debt.

On 30 July 1987 the Board entered an order denying the appellant the right to stand for the bar examination. On 24 March 1988 Judge D. Marsh McLelland remanded the case to the Board with instructions (1) to determine whether the failure of the applicant to make full disclosure concerning his places of residence, his prior employment, and his debts over $200.00 were purposeful omissions designed to mislead the Board, (2) to specify with particularity what facts it relied upon in reaching its conclusion that the applicant's answers to questions on the application displayed a lack of candor in dealing with the Board, (3) to specify with particularity how the Board reached the conclusion that in his West Virginia law practice the applicant demonstrated a pattern of carelessness, neglect and inattention to detail, and (4) to specify what facts it relied upon to support its conclusion that the applicant failed to satisfy the Board that he possesses such good moral character as to be entitled to the high regard and confidence of the public.

**IN RE LEGG**

[325 N.C. 658 (1989)]

On remand the Board found that the applicant's failure to make full disclosure of his places of residence, prior employment and debts over $200.00 were not inadvertent but evidenced a lack of candor and fairness in dealing with the Board. The Board found that the appellant's answers to various questions on the application displayed a lack of candor and fairness. In particular the Board held the failure to list his places of residence, his places of employment, his debts in excess of $200.00, and the magistrate's court action against him indicated a pattern of failing to disclose material matters. It held the applicant had offered no plausible explanation for his failure to fully disclose the matters requested of him and rejected his claim that his failure to list these matters was due to inadvertence. It found the effect of these omissions was to mislead and deceive the Board. The Board said that its finding that while the appellant was engaged in the practice of law in West Virginia he demonstrated a pattern of carelessness, neglect, and inattention to detail was supported by his failure to pay the debts for rent and to the private investigator, his failure to review his files to see if other debts were owed and his failure to return the file to the woman he had represented in an action for child support. The Board held that the applicant had not satisfied it that he possesses the qualifications of character and general fitness requisite to practice law in this state.

I believe the Board erred in its findings of fact and conclusions. It appears to me that if the appellant had included all the matters on his application which he omitted it would not have prevented him from taking the bar examination. The appellant must have known this and the only plausible reason for his failing to do so was inadvertence. He may not have understood the importance of furnishing this explanation but this does not mean he consciously attempted to mislead the Board. I believe the testimony of the appellant was credible and there was no contrary evidence. The Board should have accepted it. See *In re Rogers*, 297 N.C. 48, 253 S.E.2d 912 (1979).

As to the finding that while he was practicing law in West Virginia he demonstrated a pattern of carelessness, neglect, and inattention to detail, the Board held this was based on the failure to pay the debt to the private investigator, his failure to pay his rent, his failure to review his files after his law practice was closed to see if any other payments were due, and his failure to deliver a file to a client for whom he had obtained a judgment.

The failure to pay the rent and the failure to pay the private investigator were matters that occurred after the appellant's West Virginia law practice was closed. I do not believe they support any conclusion as to what he did while practicing law in West Virginia. There is no evidence as to anything that would have been revealed had the files been reviewed. I do not believe this supports any conclusions as to how the appellant practiced law in West Virginia. The evidence showed that the appellant represented 298 clients while practicing law in West Virginia. The finding by the Board against him is that he failed to deliver a file to one client. If we add to this his overlooking a bill to a private investigator until the matter was called to his attention, I hardly believe this establishes a pattern of carelessness, neglect, and inattention to detail in his West Virginia law practice.

I vote to reverse the Board of Law Examiners.

Justice MITCHELL joins in this dissenting opinion.