IN THE SUPREME COURT OF NORTH CAROLINA

No. 158PA23

Filed 22 August 2025

MAURICE DEVALLE

v.

NORTH CAROLINA SHERIFFS' EDUCATION AND TRAINING STANDARDS
COMMISSION

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision
of the Court of Appeals, 289 N.C. App. 12, 887 S.E.2d 891 (2023), affirming an order
entered on 22 November 2021 by Judge James Gregory Bell in Superior Court,
Columbus County. Heard in the Supreme Court on 25 February 2025.

> *The McGuinness Law Firm, by J. Michael McGuinness, for petitioner-appellee.*
>
> *Jeff Jackson, Attorney General, by J. Joy Strickland, Assistant Attorney General, for respondent-appellant.*
>
> *Jennifer D. Spyker and E. Hardy Lewis for North Carolina Advocates for Justice and State Employees Association of North Carolina, Inc., amici curiae.*
>
> *Essex Richards, P.A., by Norris A. Adams II, for North Carolina State Lodge of the Fraternal Order of Police, amicus curiae.*
>
> *Ellis & Winters LLP, by Jeffrey S. Warren; and Robert F. Orr for Southern States Police Benevolent Association, amicus curiae.*

NEWBY, Chief Justice.

In this case we determine whether respondent North Carolina Sheriffs'
Education and Training Standards Commission arbitrarily or capriciously denied

petitioner's application for justice officer certification upon concluding he lacked the good moral character required of deputy sheriffs. To answer this question, we apply the whole record test, under which we consider whether substantial evidence supports the findings, conclusions, and result of respondent's decision. Here petitioner's sworn testimony constitutes substantial evidence supporting respondent's conclusion that he lacked the requisite candor and truthfulness at the times relevant to his petition. We therefore reverse the decision of the Court of Appeals.

Petitioner Maurice Devalle served with the North Carolina State Highway Patrol from 1998 through 24 April 2017, attaining the rank of sergeant. On 11 November 2016, the Highway Patrol received a tip from a local news station suggesting that petitioner—who was supposed to be working that day—was at his home instead. The news station also alleged it had photographs and videos of petitioner skipping work or leaving his shift early on multiple occasions. The Highway Patrol immediately ordered one of petitioner's supervisors, Lieutenant J.C. Morton,[1] to visit petitioner's residence and investigate. Before doing so, Lieutenant Morton noted that petitioner had logged into the Highway Patrol's internal computer system earlier that day and marked himself as on duty.

Upon arriving at petitioner's home, Lieutenant Morton observed petitioner's

---

[1] Throughout this opinion, we refer to individuals by the titles they held at the time of the relevant events (e.g., "Lieutenant," "Sheriff," and "Principal").

patrol vehicle parked in the driveway. Petitioner's wife greeted Lieutenant Morton on the front porch. About two minutes later, petitioner himself stepped outside wearing shorts and a t-shirt. When Lieutenant Morton asked petitioner why his name appeared on duty in the computer system, petitioner said he was ill and claimed to have been experiencing technical difficulties with his mobile computer. He nonetheless assured Lieutenant Morton that he was neither working nor intending to claim his time at home as time worked. Petitioner then accused Lieutenant Morton of "setting [him] up," called him a "poor leader," and questioned his "legacy" with the Highway Patrol. After leaving petitioner's home, Lieutenant Morton checked the computer system again, at which point he saw that petitioner had logged off roughly two minutes before stepping outside his residence.

The Highway Patrol launched a formal investigation. It learned that petitioner had given a false home address to make it seem as though he lived within the mandatory twenty-mile radius of his duty station in Wayne County when he in fact lived forty-four miles away in Wake County.[2] Moreover, it found that petitioner had submitted false time sheets—and therefore received a taxpayer-funded paycheck—for the time he spent at home.

When interviewed during the Highway Patrol's investigation, petitioner

---

[2] The Highway Patrol's investigation also concluded that petitioner's supervisors knew he lived in Wake County, although they were unaware he had been skipping work and had never authorized him to work from home.

admitted that he would occasionally mark himself on duty in Wayne County even while he remained at home in Wake County. Petitioner nonetheless claimed to have been performing administrative tasks, including "sending emails," whenever he was at home instead of at his duty station. But petitioner's computer logs revealed that he sent just two emails on the days he had allegedly worked from home, one of which concerned his fantasy football team. The Highway Patrol fired petitioner in April 2017, concluding that his actions showed "substantiated untruthfulness, neglect of duty, and insubordination" and that he had knowingly violated the residency policy.

Petitioner sought administrative review of the Highway Patrol's decision. On 7 August 2017, North Carolina Department of Public Safety Secretary Erik Hooks upheld petitioner's termination on the grounds that he had been untruthful and neglected his duties. The Secretary's decision rejected the story petitioner gave Lieutenant Morton on 11 November 2016:

> I find your excuse that you were home on that occasion because you were sick to be *without any credibility whatsoever*. If you were truly sick, as you contend, you should not have checked [on duty], especially since, as a matter of policy, you were not authorized to check [on duty] until you crossed the Wayne/Johnston county line. Furthermore, you did not inform your supervisor that you were sick or otherwise unable to report for duty and although you were assigned as the district duty officer on that date, you did not make any arrangements with another district supervisor to cover the Duty Officer Responsibilities for the district. Finally, you did not check [off duty] until after [Lieutenant] Morton arrived at your residence and discovered you were not at your assigned

duty station.

(Emphasis added.) Secretary Hooks explained that the evidence did not support terminating petitioner's employment for insubordination. He further noted that he was "not concerned" by petitioner's violation of the Highway Patrol's residency policy. Accordingly, he chose not to base his decision on either of those charges.

Nonetheless, the Secretary continued:

> I am very much concerned . . . that there were times when you were at your Wake County residence while you were "on the clock" and . . . that you provided false, misleading[,] and inaccurate information to the Highway Patrol thereby resulting in your receiving credit and payment . . . . Your above-described pattern of deliberately misrepresenting information concerning your work activities has embarrassed the Highway Patrol and discredited you personally as a member of the Highway Patrol. Additionally, your demonstrated pattern of behavior demonstrates a willingness on your part to be deliberately untruthful, calls into question your credibility as a member of the Highway Patrol[,] *and severely impairs your ability to testify in court as a sworn law enforcement officer.*

(Emphasis added.) The Secretary's decision ended petitioner's tenure with the Highway Patrol.

In petitioner's own words, roughly "two days" after his termination, he accepted a position with the Columbus County Sheriff's Office as a deputy sheriff and school resource officer at East Columbus High School. He did not wait to rebuild his reputation but instead immediately applied with respondent—the administrative

agency with oversight of sheriffs and their deputies—for justice officer certification.[3,4]

Over the next year and a half, petitioner gained the trust of his colleagues and supervisors at both the school and sheriff's office. The undisputed evidence shows that petitioner worked diligently to restore his character and reputation. As a school resource officer, petitioner developed what the school's principal called a special "bond" with the students. Petitioner helped coach the football and track teams,

---

[3] The General Statutes define a "justice officer" as "[a] person who, under the special trust and confidence of the sheriff, has taken the oath of office . . . as a peace officer in the office of the sheriff." N.C.G.S. § 17E-2(3)(a) (2023). Justice officers include deputy sheriffs. *Id.* Service as a justice officer generally requires certification, though new justice officers typically serve one-year probationary periods between taking the oath of office and obtaining licensure. *See id.* §§ 17E-4, -7, -9; 12 N.C. Admin. Code 10B .0204 (2023).

[4] North Carolina is the only state that divides regulatory oversight of law enforcement officers between two executive agencies. Although the General Assembly delegates authority over most law enforcement personnel—including police officers and state troopers—to the Criminal Justice Education and Training Standards Commission, *see* N.C.G.S. § 17C-2 (2023), the legislature affords respondent the equivalent power over elected sheriffs and their subordinates, *see id.* § 17E-2.

This unique division is grounded in the text of our state constitution. Chapter 17E of our General Statutes, which outlines respondent's authority, begins by recognizing that the constitution requires each county to elect a county sheriff. *Id.* § 17E-1. *See generally* N.C. Const. art. VII, § 2 ("In each county a Sheriff shall be elected by the qualified voters thereof . . . ."). Although the constitution does not expressly mention deputy sheriffs, this Court has long recognized that a sheriff's deputy serves as "the sheriff's right-hand man," making his duties "coequal in importance with those of his chief." *Styers v. Forsyth County*, 212 N.C. 558, 564, 194 S.E. 305, 308 (1937); *see also* N.C.G.S. § 17E-1 (2023) ("The deputy sheriff has been held by the Supreme Court of this State to hold an office of special trust and confidence . . . ."). The General Assembly therefore considers the offices of sheriff and deputy sheriff "of special concern to the public health, safety, welfare, and morals of the people of the State." N.C.G.S. § 17E-1 (2023).

Accordingly, petitioner's job with the Highway Patrol required him to be certified with the Criminal Justice Commission as a criminal justice officer. *See id.* §§ 17C-1, -4. But when petitioner accepted his new role with the Columbus County Sheriff's Office, state law required respondent to evaluate him for certification as a justice officer. *See id.* §§ 17E-1, -4.

bought shoes and meals for students in need, offered guidance and support to those dealing with family trauma, and served as a positive role model and mentor.

In January 2019, respondent informed petitioner that it intended to deny his application because its Probable Cause Committee had determined that he lacked good moral character.[5] Respondent based this assertion on its review of petitioner's misconduct while he served with the Highway Patrol. It did not conduct an independent investigation for certification to serve as a deputy sheriff and school resource officer, nor did it consider how petitioner's character might have changed since he chose to apply in August 2017.

Petitioner filed a contested case petition to challenge respondent's initial determination. An administrative law judge (ALJ) heard petitioner's case over two days in December 2019. *See generally* N.C.G.S. § 150B-40(e) (2023) (authorizing certain agencies to request that an ALJ preside over contested cases in lieu of the agency's own presiding officer, as well as explaining the ALJ's duty to "propos[e]" a final decision for the agency's consideration). At the hearing, petitioner presented evidence of his character's rehabilitation via the testimonies of two supporting witnesses. The elected sheriff of Columbus County, Steadman Jody Greene, testified that he knew about petitioner's dismissal from the Highway Patrol before hiring him

---

[5] *See generally* 12 N.C. Admin. Code 10B .0201 (2023) (providing that "[b]efore taking any action against an . . . individual" who is "reported to be or suspected of being in violation of [respondent's] Rules," there must be an investigation and, when necessary, referral to the Probable Cause Committee, which may "determine the appropriate sanctions against the violator").

as a deputy sheriff.[6] Sheriff Greene explained that petitioner's job performance went "above and beyond" expectations; that he placed "special trust and confidence" in petitioner; and that he had no doubts about petitioner's ability to tell the truth. Jeremiah Johnson, the principal of East Columbus High School, echoed the sheriff's opinion of petitioner's truthfulness and praised petitioner as "dedicated to the school, dedicated to the students, dedicated to the staff . . . . [and] almost my right-hand man." Principal Johnson also stated that petitioner was the best school resource officer with whom he had ever worked. "He is an awesome man. And I'm not just saying that for me. I'm saying that for my kids at my school."

Petitioner testified as well. His answers to questions from opposing counsel, however, led the ALJ to note his "lack of candor and sincerity." Specifically, the ALJ observed that petitioner "feigned a lack of memory or confusion" in the face of opposing counsel's questions and characterized petitioner as "evasive and elusive even after having his recollection refreshed." The ALJ believed that this demeanor contrasted with how petitioner "readily recollected [the relevant]

---

[6] But Sheriff Greene—a former state trooper himself—also testified that he did not know the underlying reasons for petitioner's dismissal, either at the time he hired petitioner or at the time of his testimony: "I'm aware that [it] happened, but as far as the particulars, I was stationed [with the Highway Patrol] in Robeson County at the time. I have no idea what it was. I'm just here to speak on what [petitioner] does for me." The sheriff said he hired petitioner based on recommendations from various members of the local community. Petitioner recalled their first meeting as follows: "[T]wo days after I was terminated, somewhere around there. I walked in, gave [Sheriff Greene] my Internal Affairs file, told him what had happened, and he stated to me, 'The same old Highway Patrol [bulls--t].'" Sheriff Greene then asked petitioner "what [he] wanted to do," to which petitioner replied that he wanted to become a school resource officer.

circumstances . . . when questioned by his own counsel." Those concerns notwithstanding, the ALJ concluded that the testimonies of Sheriff Greene and Principal Johnson proved petitioner's successful character rehabilitation.[7]

Respondent's final agency decision, however, indefinitely denied petitioner's certification after concluding that he had *not* demonstrated the requisite good moral character of a deputy sheriff. Although respondent acknowledged the statements of Sheriff Greene and Principal Johnson, noting that they "provided credible and persuasive testimonies regarding [p]etitioner's rehabilitation," respondent believed that "[p]etitioner's own conduct" at the hearing outweighed his supporting evidence.

Petitioner sought judicial review of respondent's decision in Superior Court, Columbus County. *See generally id.* § 150B-43 (2023) (providing a right to judicial review of final decisions in contested cases). The trial court reversed respondent's decision, concluding that petitioner "presently has good moral character" and that respondent's decision was unsupported by substantial evidence. The trial court ordered respondent to certify petitioner retroactive to August 2017, the time he applied for certification.

Respondent appealed to the Court of Appeals. The Court of Appeals

---

[7] The ALJ nonetheless recommended that respondent deny petitioner's certification on a different ground: the existence of probable cause to believe his conduct with the Highway Patrol constituted a misdemeanor offense. *See generally* N.C.G.S. § 150B-40(e) (2023) (establishing the ALJ's responsibility to "make a proposal for" respondent's final decision); *id.* § 14-230 (explaining the offense of "[w]illfully failing to discharge duties"). The misdemeanor question is not part of the appeal before this Court.

unanimously affirmed the trial court, holding that the standards respondent applied to petitioner's case arbitrarily, discriminatorily, or capriciously departed from those respondent applied in an earlier case. *Devalle v. N.C. Sheriffs' Educ. & Training Standards Comm'n*, 289 N.C. App. 12, 27, 887 S.E.2d 891, 900 (2023) (citing *Royall v. N.C. Sheriffs' Educ. & Training Standards Comm'n*, Final Agency Decision, 09 DOJ 5859 (N.C. Sheriffs' Educ. & Training Standards Comm'n Jan. 5, 2011) [hereinafter *Royall*]). This Court allowed respondent's petition for discretionary review.

The North Carolina Administrative Procedure Act sets the standard under which we evaluate respondent's final decision. *See* N.C.G.S. § 150B-51(b) (2023). Because petitioner challenges the final decision on the grounds that it is "[a]rbitrary, capricious, or an abuse of discretion," *id.* § 150B-51(b)(6), we "us[e] the whole record standard of review," *id.* § 150B-51(c). The whole record test requires us to consider whether respondent's decision is justified by substantial evidence—put differently, evidence that "when considered as a whole, . . . a reasonable person might accept as adequate to support a conclusion." *N.C. State Bar v. DuMont*, 304 N.C. 627, 643, 286 S.E.2d 89, 99 (1982). We do not second-guess how respondent weighed the evidence. Rather, we ensure that respondent reasonably grounded its decision in the evidentiary record, even if we might have concluded differently if addressing the question anew. *See In re Elkins*, 308 N.C. 317, 321–22, 302 S.E.2d 215, 217–18 (1983) ("The reviewing court must take into account whatever evidence in the record

detracts from the [agency]'s decision as well as that which supports the decision, but the reviewing court is not allowed 'to replace the [agency]'s judgment as between two reasonably conflicting views . . . .' " (quoting *Thompson v. Wake Cnty. Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977))); *In re Rogers*, 297 N.C. 48, 65, 253 S.E.2d 912, 922 (1979) ("[T]he 'whole record' test is not a tool of judicial intrusion . . . .").[8]

Chapter 17E of the General Statutes authorizes respondent to "fix other qualifications for the employment and retention of justice officers including . . . good moral character." N.C.G.S. § 17E-7(c) (2023). Accordingly, respondent mandates that all justice officers in this State possess

> good moral character as defined in: *In re Legg*, 325 N.C. 658, 386 S.E.2d 174 (1989); *State v. Benbow*, 309 N.C. 538, 308 S.E.2d 647 (1983); *In re Willis*, 288 N.C. 1, 215 S.E.2d 771 (1975), *appeal dismissed*[,] 423 U.S. 976 (1975); *State v. Harris*, 216 N.C. 746, 6 S.E.2d 854 (1940*)*; *In re Dillingham*, 188 N.C. 162, 124 S.E. 130 (1924); *In re Applicants for License*[,] 143 N.C. 1, 55 S.E. 635 (1906); and

---

[8] Although the statute requires us to apply the whole record test, we note that the standard makes particular sense in the context of certifying law enforcement officers. Law enforcement is a difficult and often thankless job. Correct decisions and good deeds tend to go unnoticed, whereas misconduct and mistakes are scrutinized at the local, state, and national levels. The bad actions of one officer unfairly malign the good reputations of countless others. Given the far-reaching consequences of officer misconduct, it is crucial that law enforcement retains for itself the ability to determine whether an applicant possesses good moral character. Respondent—an administrative body comprising fifteen voting members, including twelve county sheriffs—is best equipped to make that decision regarding applicants for the unique role of deputy sheriff. *See* N.C.G.S. § 17E-1 (2023) (stating that sheriffs and their deputies "require particularized and differential" education and training relative to other law enforcement personnel); *see also id.* § 17E-3 (establishing respondent's membership criteria).

later court decisions.

12 N.C. Admin. Code 10B .0301(12) (2023) (italics added).

Our precedents defining "good moral character" have recognized the standard's inherent vagueness.[9] *In re Willis*, 288 N.C. at 10, 215 S.E.2d at 777 (quoting *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 262–63, 77 S. Ct. 722, 728 (1957)). Nonetheless, they still articulate the "well-defined contours" of the good moral character rule in this State, *id.* at 11, 215 S.E.2d at 777, the use of which dates back to 1760, *see* Albert Coates, *Standards of the Bar*, 6 N.C. L. Rev. 34, 38 (1927) (summarizing the standard's history in North Carolina). Relevant here, good moral character is "something more than [the] absence of bad character." *In re Rogers*, 297 N.C. at 58, 253 S.E.2d at 918 (alteration in original) (quoting *In re Farmer*, 191 N.C. 235, 238, 131 S.E. 661, 663 (1926)). "Such character expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing, if it is right, and the resolve not to do the pleasant thing, if it is

---

[9] To be clear, however, this Court and the Supreme Court of the United States have consistently concluded that the good moral character standard is not *unconstitutionally* vague. *See, e.g.*, *In re Willis*, 288 N.C. at 11, 215 S.E.2d at 777 ("[T]he term 'good moral character,' although broad, has been so extensively used as a standard that its long usage and the case law surrounding that usage have given the term well-defined contours which make it a constitutionally appropriate standard." (first citing *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 262–63, 77 S. Ct. 722, 728 (1957), and then citing *Law Students Civ. Rts. Rsch. Council, Inc. v. Wadmond*, 401 U.S. 154, 159, 91 S. Ct. 720, 724–25 (1971))). Indeed, application of the rule naturally "involves an exercise of delicate judgment" and "an intuition . . . [that] sums up many unnamed and tangled impressions." *Id.* at 19, 215 S.E.2d at 782 (quoting *Schware v. N.M. Bd. of Bar Exam'rs*, 353 U.S. 232, 248, 77 S. Ct. 752, 761 (1957) (Frankfurter, J., concurring)).

wrong." *Id.* at 58, 253 S.E.2d at 918 (quoting *In re Farmer*, 191 N.C. at 238, 131 S.E. at 663). Although "[g]ood moral character has many attributes, . . . none are more important than honesty and candor." *In re Legg*, 325 N.C. at 672, 386 S.E.2d at 182 (quoting *In re Green*, 464 A.2d 881, 885 (Del. 1983) (per curiam)). To prove good moral character, an applicant "must have conducted himself as a man of upright character ordinarily would, should[,] or does." *In re Rogers*, 297 N.C. at 58, 253 S.E.2d at 918 (quoting *In re Farmer*, 191 N.C. at 238, 131 S.E. at 663).

We note that most of the cases cited in respondent's rule dealt with good moral character in the context of admission to the bar. But this fact does not preclude respondent from applying these decisions to justice officers. The ethical duties of attorneys and justice officers overlap significantly. *See In re Applicants for License*, 143 N.C. at 17, 55 S.E. at 640 (Clark, C.J., concurring) ("It is true lawyers are officers of the Court; but so are sheriffs, clerks, and the like . . . ."). And the principles that compose good moral character—such as honesty, sincerity, integrity, candor, and forthrightness—are not unique to attorneys or even the legal field in general. Instead, they should be familiar to every North Carolinian regardless of profession. They make up the implicit moral code guiding how we treat others and expect others to treat us.

One of the cases cited in respondent's administrative rule, *In re Willis*, is particularly instructive here. The petitioner there had been discharged from the Air Force "on account of continuous poor performance, indifferent attitude, lack of responsibility, immaturity[,] and low order of intellect and potential." *In re Willis*,

288 N.C. at 5, 215 S.E.2d at 774. He subsequently attended law school and applied for admission to the bar. *Id.* at 3, 215 S.E.2d at 772.

But when the petitioner completed the bar's character and fitness questionnaire, he repeatedly downplayed and mischaracterized his prior conduct. For example, one question asked him to recount with "facts and details" whether he had "ever been charged with or questioned regarding any crime, either felony or misdemeanor." *Id.* at 5, 215 S.E.2d at 774. He answered, "I was questioned on suspicion in Catonsville, Maryland and released without any charges around 1962." *Id.* at 4, 215 S.E.2d at 773. The actual incident, however, was much less benign:

> In May 1964, while the [petitioner] was living in Catonsville, Maryland, he was arrested and investigated on a charge of burglary. Later he was charged with trespass. The record reflects that the incident giving rise to this occurrence happened on or about May 6, 1964, when the [petitioner] went to the home of Mrs. Carey Elizabeth Smith about 1:30 a.m., climbed on her porch[,] and began knocking on the second floor bedroom window. Shortly thereafter, he was arrested by the police. He was released on bond posted by his wife. The record shows that the [petitioner] failed to appear at the trial at Catonsville on May 8, 1964, and his bond was forfeited, a verdict of guilty of trespassing was entered[,] and [he] was assessed a fine in the amount of $28.00.

*Id.* at 5–6, 215 S.E.2d at 774. Moreover, when asked to address the circumstances of his dismissal from the Air Force, the petitioner claimed to have been honorably discharged when he had in fact "received a general discharge under honorable conditions." *Id.* at 17, 215 S.E.2d at 781. The totality of his answers led the Board of Law Examiners to deny his application because of poor moral character. *Id.* at 6, 215

S.E.2d at 774.

The petitioner filed for judicial review, asserting in pertinent part that the board had arbitrarily or capriciously prevented him from sitting for the bar exam. *Id.* at 7, 215 S.E.2d at 775. This Court rejected that argument. It acknowledged that the petitioner's explanation of the trespassing charge, standing alone, "would seem to rebut any suggestion that this one incident . . . would be a sufficient indication of bad moral character to exclude him from the practice of law." *Id.* at 18, 215 S.E.2d at 781. But it explained that the board's decision showed that the board "*was as concerned, if not more so*, with the [petitioner]'s failure to fully disclose the incident in his application." *Id.* (emphasis added). This Court also pointed out the "misleading" way in which the petitioner described his exit from the Air Force, leading this Court to infer "he was trying to conceal the fact that he did not receive an honorable discharge." *Id.* at 17, 215 S.E.2d at 781; *cf. In re Elkins*, 308 N.C. at 327, 302 S.E.2d at 221 ("Material false statements can be sufficient to show the applicant lacks the requisite character and general fitness for admission to the Bar." (citations omitted)). This Court further noted that the petitioner's poor conduct as an enlisted serviceman, though several years in the past, was nonetheless relevant to determining his moral fitness to practice law. *In re Willis*, 288 N.C. at 17, 215 S.E.2d at 781 ("Dereliction of duty and an indifferent attitude toward one's obligations . . . are certainly character traits undeserving of public confidence.").

Accordingly, this Court affirmed the board's final decision after applying the

whole record test: "How the [petitioner's] character traits indicated by his military record were affected by the lapse of time, by his change in fields of endeavor, and by his answers to [the questionnaire] was for the Board of Law Examiners to determine from all the testimony and evidence before it." *Id.* at 17, 215 S.E.2d at 781. Because the record contained evidence to support denying the petitioner's application, this Court recognized that it could not "substitute its judgment for that of the Board of Law Examiners." *Id.* at 16, 215 S.E.2d at 780 (first citing *Konigsberg*, 353 U.S. 252, 77 S. Ct. 722; and then citing *Schware v. N.M. Bd. of Bar Exam'rs*, 353 U.S. 232, 77 S. Ct. 752 (1957)).

Examining the present case under the same standard, we likewise conclude that substantial evidence supports respondent's decision. The testimonies of Sheriff Greene and Principal Johnson showed how petitioner's character had progressed from 2016, as respondent fully acknowledged in its final decision. Respondent nonetheless believed that these statements were outweighed by petitioner's own lack of candor at the hearing—specifically, how he "feigned a lack of memory or confusion" when questioned by opposing counsel despite "readily recollect[ing]" the same events when examined by his own attorney.

The evidentiary record supports this determination. For instance, petitioner repeatedly insisted he could not remember basic, general details of the misconduct that led the Highway Patrol to fire him—such as whether he had *ever* gone home from a shift in Wayne County at lunch time, or whether he had *ever* marked himself as on

duty when he was instead not working and at home—because "it's been four years."

As just one example, petitioner gave the following responses to questions regarding when he first started working from home:

> [RESPONDENT'S COUNSEL]: [Your Highway Patrol supervisor in Wayne County] never told you [that] you could work from home, did he?
>
> [PETITIONER]: No, sir.
>
> [RESPONDENT'S COUNSEL]: And how long have you been working from home?
>
> [PETITIONER]: Sir, it's—I have—I can't even tell you last week of something. That's not an answer. It's not a yes or no answer with that, neither a one or two days.
>
> [RESPONDENT'S COUNSEL]: Well, you—you testified previously that your [former] supervisor—was it in Durham?—said that you could work from home?
>
> [PETITIONER]: Yes, sir.
>
> [RESPONDENT'S COUNSEL]: Okay. When did you transfer from Durham to Wayne County?
>
> [PETITIONER]: I'm thinking somewhere around 2014. I'm not sure. I don't recall.
>
> [RESPONDENT'S COUNSEL]: When you transferred to Wayne County, did you initially go to Wayne County when you reported for duty or did you report for duty from home at the very beginning?
>
> [PETITIONER]: Sir, again, it's been four years. I'm not going to speculate or try to give an opinion on something. I don't know the facts of that. I don't know what day I

reported there. . . .

. . . .

[RESPONDENT'S COUNSEL]: [I'm not asking] for exact dates . . . . [G]enerally speaking, are you able to say whether any time in 2014 once you moved to Wayne County duty station you did or did not work from home?

[PETITIONER]: Sir, I want to stick with the facts, and the facts that I can tell you are I do not know.

Even when presented with transcripts of his own prior statements and other contemporaneous evidence to refresh his recollection, petitioner continued to say he was unable to recall the events in question:

[RESPONDENT'S COUNSEL]: You don't [know] whether you logged yourself [into the computer system on 11 November 2016]?

[PETITIONER]: No, I do not. It's—

[RESPONDENT'S COUNSEL]: Okay. All right. I want to draw your attention to Respondent's Exhibit 32 again . . . . Is that your statement [from your interview during the Highway Patrol's internal investigation]?

[PETITIONER]: Yes, sir.

[RESPONDENT'S COUNSEL]: All right. It says that "I checked on approximately 3 p.m.," correct?

[PETITIONER]: Yes, sir.

[RESPONDENT'S COUNSEL]: So that—so you stated that you checked on, correct? That's your statement, is it not?

[PETITIONER]: That's not accurate, though, sir.

[RESPONDENT'S COUNSEL]: So you made false statements to [the investigators]?

[PETITIONER]: No, sir.

[RESPONDENT'S COUNSEL]: You said that "I checked on approximately 3 p.m.," correct?

[PETITIONER]: It'd either be done through a telecommunicator, computer, [or] by phone. There's many different ways, many different people that can do it, sir.

[RESPONDENT'S COUNSEL]: This says, "I checked on approximately 3 p.m."

[PETITIONER]: Maybe I'm misunderstanding what you're asking me. Did I physically enter this? I don't know.

In contrast, when examined by his own counsel, petitioner recalled the relevant events with specificity. For example, he explained that some of his decisions to stay home were motivated by Hurricane Matthew, which reached North Carolina in early October 2016. He gave a detailed account of the storm's effects on the Highway Patrol's operations in Wayne County and remembered his exact orders, as well as the supervisor who gave them:

> [PETITIONER]: . . . [E]ssentially, the Neuse River runs through the middle of Wayne County. Of course, it flooded [during the hurricane], and what it did was basically create[ ] two islands per se.
>
> [PETITIONER'S COUNSEL]: Cut the county in half?
>
> [PETITIONER]: Yes, sir.
>
> [PETITIONER'S COUNSEL]: And how did that impact the ability of troopers to travel within the county, if it did?
>
> [PETITIONER]: Oh, you—you weren't. You really weren't able to do that, especially during night. It had a huge impact on—on patrol.

[PETITIONER'S COUNSEL]: Okay. And did the flood impact your own facilities down there?

[PETITIONER]: Yes, sir.

[PETITIONER'S COUNSEL]: Tell the Court about that, please.

[PETITIONER]: The—the road that goes down into the district office was completely flooded. And if you know anything about a Dodge Charger, it has an intake underneath the engine. It pulls up, and it would pull water up. So there was no possible way for us to drive our patrol cars into the office.

[PETITIONER'S COUNSEL]: You're talking about the super charger? Is that right?

[PETITIONER]: Yes, sir.

[PETITIONER'S COUNSEL]: All right. The super charger pulls air in from underneath the car?

[PETITIONER]: Well, it—the engine. If it draws—if it takes water from underneath, then it would bog the engine down, and as a result shut the engine off [so that] it wouldn't run. The water was too high for us to drive the car through.

[PETITIONER'S COUNSEL]: All right. What about gas stations?

[PETITIONER]: They ran out of gas.

[PETITIONER'S COUNSEL]: All right. And did that decrease your mobility?

[PETITIONER]: Absolutely.

[PETITIONER'S COUNSEL]: And were you given—do you recall being given any orders about this particular situation?

[PETITIONER]: Yes, sir.

[PETITIONER'S COUNSEL]: What were they?

[PETITIONER]: We were told to not patrol at all. Do not drive at all, unless it was an emergency situation.

[PETITIONER'S COUNSEL]: And who told you that?

[PETITIONER]: First Sergeant [Gerald] Burton.[10]

As a final illustration, petitioner gave the following responses to questions from respondent's counsel about the Highway Patrol's reasons for terminating his employment:

[RESPONDENT'S COUNSEL]: . . . [D]o you admit that there was more than one policy that you violated?

[PETITIONER]: Yes, sir.

[RESPONDENT'S COUNSEL]: And do you admit that one of those is truthfulness?

[PETITIONER]: I did not violate that policy. I was truthful the entire time with the Highway Patrol.

[RESPONDENT'S COUNSEL]: Do you admit that one of them was neglect of duty?

[PETITIONER]: What you're stating are—is the charge sheet against me.

[RESPONDENT'S COUNSEL]: Well, no—

---

[10] At the same hearing, First Sergeant Burton testified that he had ordered petitioner to "be in a response mode, which would be [to] stay stationary and for the sergeants that would be at the district office, if needed, [to] go out and handle the situation *but come back to the office.*" (Emphasis added). First Sergeant Burton also stated that some of petitioner's job duties required petitioner's physical presence in Wayne County and that he had not authorized petitioner to work from home during the hurricane. According to First Sergeant Burton, the storm left petitioner's office "mainly operational. Power would go in and out. Some flood waters came up and around [it]. However, you could get there, and that's where you could get your fuel. And so that was kind of home base."

[PETITIONER]: And that was—

[RESPONDENT'S COUNSEL]: I'm talking about the findings that are here in Exhibit 1[,] that's already part of the record, the affidavit of separation.

[PETITIONER]: I don't—Secretary Hooks actually removed several of those. So I'm not—I don't recall exactly what I was terminated for, what you're stating there.

Based on the evidence, respondent was able to conclude that petitioner lacked candor and truthfulness. *See, e.g.*, *In re Elkins*, 308 N.C. at 323, 302 S.E.2d at 218 (noting "numerous contradictions and inconsistencies" with a bar applicant's answers at an administrative hearing "from which the Board [of Law Examiners] could conclude that [he] was testifying falsely with the intent to deceive"); *cf. In re Legg*, 325 N.C. at 671, 386 S.E.2d at 181–82 ("It is well settled that the credibility of witnesses and the probative value of particular testimony are for the administrative body to determine . . . ." (quoting *State ex rel. Utils. Comm'n v. Duke Power Co.*, 305 N.C. 1, 21, 287 S.E.2d 786, 798 (1982))). Petitioner's evasive answers at the hearing frustrated respondent's ability to evaluate the extent of his character rehabilitation. Just as this Court recognized in *In re Willis* and *In re Elkins*, these types of responses are inconsistent with the commonly understood perceptions of candor and truthfulness. They constitute substantial evidence from which respondent could find petitioner lacked good moral character.[11] *See In re Burke*, 368 N.C. 226, 231, 775

---

[11] Petitioner also contends that respondent's decision violated *In re Moore*, 301 N.C. 634, 272 S.E.2d 826 (1981), an opinion this Court issued shortly before deciding *In re Elkins*. In that case, the Board of Law Examiners had denied a bar application on character grounds

S.E.2d 815, 819 (2015) ("Testimony that is contradictory, inconsistent, or inherently incredible is a sufficient basis upon which to deny admission on character grounds." (quoting *In re Braun*, 352 N.C. 327, 335, 531 S.E.2d 213, 218 (2000))).

In holding that substantial evidence did not support respondent's decision, the Court of Appeals looked to respondent's final agency decision in *Royall v. North Carolina Sheriffs' Education and Training Standards Commission*. The Court of Appeals particularly emphasized respondent's acknowledgment in *Royall* that "concerns about the flexibility and vagueness of the good moral character rule" meant revocations of justice officer certification "should be reserved for clear and severe cases of misconduct." *Devalle*, 289 N.C. App. at 22–23, 887 S.E.2d at 899 (emphasis

due to the applicant's apparent untruthfulness at an administrative hearing. *Id.* at 638–39, 272 S.E.2d at 829. This Court reversed because the board's decision "did not indicate which [of the applicant's] statements it considered to be untruthful," thereby enabling "neither a reviewing court nor the applicant [to] be certain as to the content or materiality of the false statements referred to." *Id.* at 640, 272 S.E.2d at 830. We recently explained that the purpose of *In re Moore* is "to permit appellate review" of an agency's legal conclusions and enable them to "be tested against the evidence." *Ashe County v. Ashe Cnty. Plan. Bd.*, 913 S.E.2d 213, 228 n.14 (N.C. 2025).

Here respondent summarily concluded, "Petitioner's profound lack of candor and truthfulness while testifying under oath at this contested case demonstrated that truthfulness is still a challenge for [him]." We agree that in many contexts, respondent's nonspecific conclusion would frustrate appellate review. But in this particular case, the "profound" nature of petitioner's untruthfulness permeates throughout his entire testimony. Moreover, respondent *did* make specific factual findings about petitioner's untruthfulness at the hearing, even if it did not expressly incorporate them into its conclusions of law. Thus, respondent did not impair our appellate review. *See In re Elkins*, 308 N.C. at 328, 302 S.E.2d at 221 (distinguishing *In re Moore* from a case in which the applicant's testimony was "internally inconsistent, intrinsically implausible[,] and repeatedly contradicted by substantial evidence"); *In re Braun*, 352 N.C. 327, 331–32, 531 S.E.2d 213, 216 (2000) (listing various ways in which the agency decision on appeal could be differentiated from the facts of *In re Moore*).

omitted) (quoting *Royall* at 14). The court also noted that respondent had decided not to revoke the *Royall* petitioner's certification "in light of his otherwise exemplary history of good moral character and professionalism in law enforcement." *Id.* at 23, 887 S.E2d at 898 (quoting *Royall* at 16). The Court of Appeals believed that respondent did not "apply the same standard" in the instant case that it had applied to the "*similarly situated individual*[ ]" in *Royall. Id.* at 27, 887 S.E.2d at 900 (emphasis added). The court therefore concluded that respondent's decision constituted an "arbitrary, discriminatory[,] or capricious application of the good moral character standard." *Id.* at 27, 887 S.E.2d at 900 (quoting *In re Willis*, 288 N.C. at 19, 215 S.E.2d at 782).

But *Royall* and this case are not the analogues implied by the opinion below, and the respective petitioners in each are not "similarly situated individuals." The petitioner in *Royall*, a deputy sheriff whom respondent had first certified fourteen years earlier, learned through a colleague about a major drug bust conducted by the federal Drug Enforcement Agency. *Royall* at 3–4. Since the deputy's colleague told him that the information came directly from a DEA agent, the deputy "knew [the DEA's case] to be closed" because "[o]fficers do not freely talk about open cases." *Id.* at 5. Over the next few days, the deputy continued to hear about the drug bust from additional colleagues in other sheriffs' offices; again, nothing suggested that the investigation was ongoing. *Id.* at 5–6. The deputy therefore posted several comments on an online local news forum congratulating the DEA on its successful operation. *Id.*

at 6.

The deputy's posts, however, inadvertently disclosed the still-confidential amount of money the DEA had seized. *Id.* Based on his several conversations with his colleagues, the deputy honestly believed that the DEA had already closed the case and made this information public knowledge. *Id.* But in fact, the DEA had not finished its investigation. *Id.* The DEA contacted the deputy and opened an inquiry with which the deputy fully complied. *Id.* at 6, 12. The investigating agent told the deputy that the DEA's concern was not with him but rather with identifying the initial source of the leak. *Id.* at 6.

At a hearing to determine whether respondent should revoke the deputy's certification, the deputy's colleagues, supervisors, and family friends lauded his integrity, work ethic, leadership, and spotless disciplinary record. *Id.* at 6–12. The testifying law enforcement personnel explained that officers frequently used online forums to update the public on local news and said they too would have assumed that the DEA's case was closed. *Id.* at 3–4, 8–10. Moreover, the DEA's internal inquiry found that the deputy's posts "[had] not jeopardize[d]" its operation "in any way." *Id.* at 11. Accordingly, respondent concluded: "Police officers and others make occasional honest mistakes and sometimes exercise poor judgment. . . . At worst, [the deputy] had an honest mistaken understanding, which is insufficient to establish a lack of good moral character." *Id.* at 15. Thus, respondent did not revoke the deputy's certification, explaining that revocations and suspensions "should be reserved for

clear and severe cases of misconduct." *Id.* at 14.

*Royall* stands in stark contrast to this case. Unlike the honest, one-time mistake of the deputy there, petitioner here knowingly abdicated his duties on multiple occasions and took affirmative steps—like falsifying his home address and time sheets—to hide his deception and reap financial reward. Unlike the situation in *Royall*, petitioner did not cooperate when initially confronted about his behavior; instead, he lied about technical difficulties with his timekeeping device and questioned his supervisor's "leadership" and "legacy." And unlike the deputy in *Royall*, petitioner continued to exhibit a lack of sincerity and candor during his administrative hearing. It was therefore reasonable and consistent for respondent not to have applied *Royall* here, especially given that *Royall*, unlike this case, did not involve "restoration of a character which ha[d] been deservedly forfeited." *In re Willis*, 288 N.C. at 13, 215 S.E.2d at 778; *see also In re Farmer*, 191 N.C. at 238, 131 S.E. at 663 (describing character rehabilitation as "a matter of time and growth"). The Court of Appeals erred in holding otherwise.

Petitioner and several amici contend that respondent's good moral character rule effectively requires law enforcement to understand and apply legal principles that confuse even licensed attorneys. Their point is well taken. It can be difficult to interpret a lone string cite, especially one intended to encapsulate a concept that both this Court and the Supreme Court of the United States have characterized as "unusually ambiguous" and "defin[able] in an almost unlimited number of ways." *In*

*re Willis*, 288 N.C. at 10, 215 S.E.2d at 776 (quoting *Konigsberg*, 353 U.S. at 263, 77 S. Ct. at 728). We therefore encourage respondent to revise its rule to *define* good moral character in light of this Court's precedents, not merely cite them.[12]

In this case, however, there is nothing confusing about why petitioner's evasive responses might have reasonably led respondent to question his candor and truthfulness, especially when petitioner gave his answers under oath and at a

---

[12] Here we highlight also that respondent's rule may have unintentionally cited *In re Applicants for License*, 143 N.C. 1, 55 S.E. 635 (1906), when it instead meant to cite *In re Farmer*, 191 N.C. 235, 131 S.E. 661 (1926). This confusion would be understandable, given that some of the cases cited in respondent's rule internally refer to *In re Farmer* by the name "*In re Applicants for License*." *See, e.g.*, *In re Legg*, 325 N.C. at 672, 386 S.E.2d at 182; *Benbow*, 309 N.C. at 548, 308 S.E.2d at 653; *In re Willis*, 288 N.C. at 13, 215 S.E.2d at 778. But the *In re Applicants for License* case cited in respondent's rule is a different decision, issued two decades before *In re Farmer*. The case cited in the rule mainly addressed a constitutional question tangentially related to good moral character—namely, whether the General Assembly had violated the separation of powers when it enacted a statute loosening the good moral character requirement for bar applicants. *See In re Applicants for License*, 143 N.C. at 5, 55 S.E. at 636 (explaining that "admission to the bar is in some sense a judicial act"). This Court upheld the statute as constitutional. *Id.* at 7, 55 S.E. at 637 ("[T]he power of the [l]egislature over the matter in question would seem to be plenary . . . ." (first citing N.C. Const. of 1868, art. II, § 1; and then citing *id.* art. IV, § 12)).

While the concurring and dissenting justices in that case expressed individual thoughts about the value of good moral character, *see, e.g.*, *id.* at 20–21, 55 S.E. at 642 (Brown, J., dissenting), the majority opinion did not attempt to define the term. Indeed, most of the majority opinion's discussion of moral character is explicitly disclaimed as the personal view of the authoring justice, not the view of this Court. *See id.* at 11–12, 55 S.E. at 638–39 (opinion of Hoke, J.) ("[W]hat valid objection can be made to this legislation? And here the writer speaks only for himself. It is said by an American author of blessed memory that it does not matter so much where a man is, as the direction in which he is moving."). By contrast, *In re Farmer* squarely examined the definition of "good moral character," *see In re Farmer*, 191 N.C. at 238, 131 S.E. at 663, as acknowledged by subsequent decisions of this Court, *see, e.g.*, *In re Rogers*, 297 N.C. at 58, 253 S.E.2d at 918 ("In the words of Chief Justice Stacy in *In re Applicants for License*, '[Good moral character] is something more than [the] absence of bad character. . . .' Character thus encompasses both a person's past behavior and the opinion of members of his community arising from it." (alterations in original) (internal citation omitted) (quoting *In re Farmer*, 191 N.C. at 238, 131 S.E. at 663)).

hearing specifically conducted to examine his character's rehabilitation. The nature of our criminal justice system often requires law enforcement officers to give sworn testimony on sensitive topics—perhaps the circumstances surrounding a murder or the reasons for searching a suspect's car. Honesty is of paramount importance. Sometimes the dispute involves the conduct of the officer or his colleagues, potentially asking the officer to put inconvenient truths above personal interests. The people of North Carolina expect law enforcement to possess not only the ability to tell the truth but also the resolve to exercise it in uncomfortable situations. One does not need to carefully consult court cases to understand this basic tenet of good moral character.[13]

Of course, character rehabilitation and forgiveness are principles deeply rooted in the common law and our State's history. But rehabilitation requires, at a minimum, accepting responsibility for one's prior bad acts. *See In re Legg*, 325 N.C. at 673, 386 S.E.2d at 182 (explaining that the "fundamental attributes of good moral character" include "the maturity and professional discipline necessary to accept responsibility"). Here petitioner only took direct accountability for violating the Highway Patrol's residency requirement, a minor infraction that petitioner's supervisors had known about all along and Secretary Hooks did not find concerning.

---

[13] Our precedents nonetheless articulate it. *See In re Farmer*, 191 N.C. at 238, 131 S.E. at 663 ("[Good] character expresses itself . . . quite often in the will to do the unpleasant thing, if it is right, and the resolve not to do the pleasant thing, if it is wrong."); *see also In re Legg*, 325 N.C. at 673, 386 S.E.2d at 182 ("The purpose of withholding certifications is not to punish the candidate but to protect the public . . . ." (quoting *In re Jenkins*, 467 A.2d 1084, 1090 (N.J. 1983))).

Although petitioner had every opportunity at the hearing to acknowledge the misconduct that "very much concerned" the Highway Patrol and Secretary, including petitioner's "demonstrated pattern" of being "deliberately untruthful," he refused to do so. Instead, he insisted that he "did not violate [the truthfulness] policy" because he "was truthful the entire time with the Highway Patrol" and claimed he could not remember basic details of his termination. Given petitioner's ability to recount these events in detail upon questioning from his own attorney—in other words, when it benefitted him—we cannot conclude that respondent's concerns about his character were arbitrary or capricious.

We close by clarifying the relevant time period for evaluating moral character and awarding retroactive certification. Here the trial court ordered respondent to certify petitioner retroactive to his application in August 2017. This also was error.

The initial burden of proving good moral character lies with the applicant because the relevant facts "are largely within the knowledge of the applicant and are more accessible to him than to an investigative board." *Id.* at 672, 386 S.E.2d at 182 (quoting *In re Willis*, 288 N.C. at 15, 215 S.E.2d at 780). Accordingly, the investigative board evaluates the applicant's character as he presented it at the time of his application. If the board "relies on specific acts of misconduct to rebut this *prima facie* showing, and such acts are denied by the applicant, then the [b]oard must establish the specific acts by the greater weight of the evidence." *Id.* at 669, 386 S.E.2d at 180 (quoting *In re Elkins*, 308 N.C. at 321, 302 S.E.2d at 217). If the applicant later seeks

to supplement his application with additional evidence of good moral character, it is incumbent upon him, not the board, to offer that evidence and satisfy his burden of proof. To the extent that an application or certification is granted retroactively, it may only be awarded retroactive to the point in time at which the applicant met his evidentiary burden.

Petitioner correctly notes that more than sixty years ago, the Supreme Court of the United States held that a state board of bar examiners could not infer an applicant's "present[ ]" character by exclusively looking at how he had conducted himself fifteen years before his application. *Schware*, 353 U.S. at 246, 77 S. Ct. at 760. But *Schware* did not discuss the applicant's moral character at the literal present moment. Instead, it more precisely referenced his character "*at the time he applied to take the bar examination.*" *Id.* at 243, 77 S. Ct. at 758 (emphasis added).

The trial court misconstrued the meaning of "present" here. Petitioner applied for justice officer certification mere days after his termination from the Highway Patrol was upheld in August 2017. He then offered evidence in December 2019 of his character's rehabilitation, was notified of respondent's final decision denying his certification in November 2020, and filed for judicial review in December 2020. Finally, in November 2021, the trial court ordered respondent to certify petitioner retroactive to August 2017 because, in the trial court's opinion, petitioner "*presently*"—that is, at the time of judicial review more than four years later—possessed good moral character. The trial court expressly stated that it had

considered petitioner's character restoration "through some five years of rehabilitation with time and growth," a time frame well beyond both the date of petitioner's application (a few days after his termination from the Highway Patrol was upheld) and the time of the administrative hearing (two years and eight months since the same).[14] The trial court asserted, without citing to authority or otherwise explaining its reasoning, that this was the "correct interpretation of the good moral character rule."

Not only is this not the correct interpretation of the rule, as we explained above, but it also exceeds the trial court's role in reviewing administrative decisions. "When the trial court exercises judicial review over an agency's final decision, it acts in the capacity of an appellate court." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 662, 599 S.E.2d 888, 896 (2004). Thus, the trial court is bound by the evidentiary record before it. It may not consider new evidence, like petitioner's post-hearing conduct, that petitioner did not present at the hearing and respondent did not evaluate. *See* N.C.G.S. § 150B-49 (2023) (explaining that the proper remedy in the case of new evidence would be a remand to respondent to consider that

---

[14] The trial court also appeared to misinterpret the relevant timeline of events. Five years before the trial court's order in November 2021 would be November 2016, the same month the Highway Patrol first became aware of petitioner's actions and ordered Lieutenant Morton to visit petitioner's home. The Highway Patrol did not fire petitioner until April 2017, after it had concluded its internal investigation. Given petitioner's own argument that his experiences as a school resource officer restored his character, the earliest that he could have even *started* this rehabilitation would have been August 2017—roughly nine months after the start of the five-year time frame applied by the trial court.

evidence); *see also id.* § 150B-51(c) ("In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record.").

In order for respondent to certify petitioner retroactive to the date of his application in August 2017, petitioner needed to prove that he actually possessed good moral character at that time. But as petitioner's counsel recognized during oral argument before this Court, there was "probably nothing" in the record to suggest that petitioner had rehabilitated his character during the short span between his termination from the Highway Patrol and his application with respondent. *See* Oral Argument at 38:49–39:13, *Devalle v. N.C. Sheriffs' Educ. & Training Standards Comm'n* (No. 158PA23), https://www.youtube.com/watch?v=h-CwrYI5lrQ. Instead, petitioner first presented evidence showing his character's improvement at the administrative hearing in December 2019. Had he successfully demonstrated his good moral character there, respondent should have certified him retroactive to December 2019, the point at which he satisfied his burden of proof. Even assuming *arguendo* that petitioner met his evidentiary burden at the hearing, the trial court erred in ordering respondent to certify him retroactive to August 2017.

In sum, respondent's indefinite denial of petitioner's justice officer certification was not arbitrary or capricious. Respondent's decision does not prevent petitioner from seeking certification in the future. *See* 12 N.C. Admin. Code 10B .0205(3)(b) (2023) (explaining that an indefinite sanction for failure to meet a minimum

employment standard applies "so long as the stated deficiency, infraction, or impairment continues to exist"). We acknowledge and appreciate petitioner's service as a school resource officer. The record before us today, however, offers substantial evidence from which respondent could reasonably believe that petitioner lacked the requisite good moral character of a deputy sheriff at the times relevant to his petition. We reverse the decision of the Court of Appeals affirming the trial court's order in favor of petitioner, thereby reinstating respondent's decision to deny justice officer certification.

REVERSED.

Justice RIGGS, dissenting.

I agree with the majority that "character rehabilitation and forgiveness are principles deeply rooted in the common law and our State's history." The majority's analysis, however, is hard to accord with those principles and is likely to confuse employees and employers alike an area of employment law that affects countless North Carolinians. The Court of Appeals did not err when it held that the Commission's denial was arbitrary and capricious, and I would thus affirm the Court of Appeals.

## I.   Factual Background

Shortly after his termination in April 2017 from the North Carolina State Highway Patrol (Patrol) for substantiated untruthfulness, neglect of duty, insubordination, and violating the Patrol's residency policy, Officer Devalle accepted a position with the Columbus County Sheriff's Office as a deputy sheriff and school resource officer (SRO) at East Columbus High School around August 2017. Up until that point, Officer Devalle had been employed by the Patrol for nineteen years, during which he received only one disciplinary action in the form of a written warning. In or about August 2017, Officer Devalle applied for deputy sheriff certification through the Columbus County Sheriff's Office.

On 29 January 2019, the North Carolina Sheriffs' Education and Training Standards Commission (the Commission) ordered Officer Devalle's certification be

denied indefinitely for his lack of good moral character and denied for five years, with the sanction suspended for five years, for the failure to discharge duties in violation of N.C.G.S. § 14-230, a class B misdemeanor (the basis of his termination from the Patrol). On 20 March 2019, Officer Devalle filed a petition for a contested case hearing with the Office of Administrative Hearings. The Administrative Hearing was held on 3 and 4 December 2019.

At the hearing, it became clear that before denying Officer Devalle's certification in January 2019, the Commission had performed virtually no independent investigative inquiry into Officer Devalle's then-present moral character. Commission Investigator Sirena Jones investigated Officer Devalle's application for certification with the Columbus County Sheriff's Department, and her "investigation" was incorporated into the proposal for decision by the administrative law judge (ALJ) under the section labeled "Respondent's Investigation." By her own account, Jones's investigation into Officer Devalle's application consisted of (1) reviewing Officer Devalle's August 2017 application; (2) reviewing and summarizing the Internal Affairs (IA) investigative file into Officer Devalle's 2016 misconduct from the Patrol; and (3) reviewing the report of separation the Patrol issued after terminating Officer Devalle. She drafted a memorandum for the Commission's Probable Cause Committee and attached her summary of the Patrol's IA file, the applicant/officer profile, and the Patrol's report of separation to such memorandum, which she sent to the Probable Cause Committee before its probable cause hearing

on Officer Devalle's certification application. By her own admission at the Administrative Hearing, Jones agreed that "her summary of the Patrol's IA file was 'essentially writing what someone else said in the Patrol's IA report.'" She also admitted her summary was not the result of an independent investigation and that she "could not recall if she actually reviewed [Officer Devalle's] time slips at issue." Nor did she obtain information from the State's payroll system for Officer Devalle. Despite agreeing that interviewing persons with knowledge is one of the primary methods an investigator would use to find facts, Jones also admitted that she "interviewed no one" in the course of her investigation. Jones did not interview Officer Devalle "because he was interviewed by the Patrol" during its 2016–2017 internal investigation. Jones also did not interview Columbus County Sheriff, Sheriff Greene, or the school principal, Principal Johnson, for whom Officer Devalle had served as SRO since August 2017. Thus, Jones' investigative results relied solely upon the Patrol's IA investigation in 2016–2017 to determine whether Officer Devalle possessed the good moral character required of all justice officers during his recertification process.

On 3 June 2020, the ALJ issued a proposal for decision, which serves as a recommendation to the Commission as the final decision-maker on Officer Devalle's certification. One conclusion within the proposal for decision was that the "credible and persuasive testimonies by Sheriff Greene and Principal Johnson demonstrated" that Officer Devalle had "restored his character so that he now possesses the good

moral character to continue certification as a deputy sheriff." The ALJ acknowledged how Officer Devalle's 2016 misconduct had harmed the public. But the ALJ also stated "[n]onetheless, Sheriff Greene and Principal Johnson established that [Officer Devalle] has rehabilitated and rebuilt his character." In other words, "[e]ven given [Officer Devalle's] cross-examination testimony at hearing," the ALJ concluded that the "totality of the evidence rebutted the finding by the Probable Cause Committee that [Officer Devalle] lacks the good moral character required of a justice officer and showed that [he] has rehabilitated his character since 2017." Though the ALJ did propose the Commission deny certification, that was based on the Class B Misdemeanor offense of "Willfully Failing to Discharge Duties" in violation of N.C.G.S. § 14-230, not the lack of good moral character.

If an individual is reported to be in violation of Commission rules, including minimum employment standards like the good moral character rule, the Commission "may take action to correct the violation and to ensure that similar violations do not occur." 12 N.C. Admin. Code 10B.0201(a) (2024). Before taking such action against the individual for the alleged violation, the Commission "shall investigate" the alleged violation. 12 N.C. Admin. Code 10B.0201(b) (2024). The ALJ noted the Commission's regulations about the permissible sanctions for the violation of the good moral character rule. Where the cause of sanction is a lack of good moral character, the denial of certification shall be "for an indefinite period, but continuing so long as the stated deficiency, infraction, or impairment continues to exist." 12 N.C. Admin.

Code 10B.0205(3)(b) (2024). Citing the North Carolina Supreme Court case *In re Dillingham*, the ALJ added that "when one seeks to establish a restoration of a character, the question becomes one of 'time and growth.'" (Quoting *In re Dillingham*, 188 N.C. 162, 165 (1924).)

To the ALJ, the evidence showed Officer Devalle had grown in the time since his termination. Specifically, the "credible and persuasive testimonies by Sheriff Greene and Principal Johnson demonstrated that [Officer Devalle] has restored his character so that he now possesses the good moral character required to continue certification as a deputy sheriff." Summarizing the Commission's presentation, the ALJ observed that it did not "present[ ] any evidence at hearing regarding [Officer Devalle's] performance of his duties as a Columbus County deputy sheriff." In fact, the Commission "failed to present any evidence concerning any activities involving [Officer Devalle] that took place more recently than 2016." In contrast, Sheriff Greene and Principal Johnson each testified about their interactions with Officer Devalle and that he had good moral character. Sheriff Greene and Principal Johnson also testified that Officer Devalle's absence would "actually be harmful to the students . . . and to the Sheriff's force, and would make [East Columbus High School] less safe." Thus, the ALJ concluded that "[e]ven given [Officer Devalle's] cross-examination testimony at the hearing, the totality of the evidence rebutted" that Officer Devalle "lacks the good moral character required of a justice officer" and that he "has rehabilitated his character since 2017." Again, the ALJ's proposal to deny

Officer Devalle's certification was based on the commission of his failure to "Willfully Failing to Discharge Duties" in violation of N.C. Gen. Stat. § 14-230, not a lack of moral character.

The ALJ's proposal for decision was overruled by the Commission in their final agency decision on 6 October 2020, which indefinitely denied Officer Devalle's certification based on lack of moral character. Despite adopting the ALJ's findings, the Commission concluded that Officer Devalle's testimony on cross-examination was sufficient proof that his "stated deficiency"—a lack of good moral character—still existed notwithstanding the "credible and persuasive" testimonies of Sheriff Greene and Principal Johnson that Officer Devalle had rehabilitated and reformed his character and that Officer Devalle "exhibited highly favorable traits" like "helping, teaching, and serving as positive role models [sic] for students." This directly conflicted with the ALJ's recommendation that the "scope and magnitude" of such positive character traits "qualify as extenuating circumstances which the [Commission] should consider in determining whether [Officer Devalle] possesses the good moral character required of a justice officer."

The Commission pointed to Officer Devalle's cross-examination testimony at his hearing to argue he had not, in fact, met the good moral character requirement. However, that testimony was the *only* evidence the Commission referenced that was of present nature. Significantly, the ALJ also considered the same cross-examination testimony in their proposal and came to a different conclusion on the issue of good

moral character. Other evidence to which the Commission pointed to was not the product of the Commission's own investigation or present-day evidence. The Commission did not specify exactly which statements it relied on in forming its conclusion; it simply stated it was his "profound lack of candor and truthfulness while testifying under oath" that "demonstrated that truthfulness is still a challenge for [him]."

After the denial of his application for certification, Officer Devalle sought judicial review in Superior Court, with Judge James Gregory Bell presiding. That court, again, concluded that Officer Devalle was rehabilitated and is presently a person of good moral character. The Superior Court, as the Commission did with the ALJ's findings, adopted all of the Commission's findings of fact and then made additional findings and conclusions of law. Even more significantly, the Superior Court adopted the Commission's interpretation of the good moral character rule—which acknowledged the rule's ambiguity—from its final agency decision in *Jeffrey Royall v. N.C. Sheriff's Education and Training Standards Commission*, 09 DOJ 5859, to form its conclusion, which was that Officer Devalle "presently has *good moral character* sufficient for certification as a Deputy Sheriff."

The Court of Appeals affirmed the Superior Court's decision and found that the Commission erred and 1) the Commission's action was unsupported by substantial evidence; 2) the Commission's decision was arbitrary and capricious; and 3) the Commission did not abide by its own good moral character standard. *Devalle*

*v. N.C. Sheriffs' Educ. & Training Standards Comm'n*, 289 N.C. App. 12, 20 (2023). I agree with the Court of Appeals.

## II. The Final Agency Decision was Arbitrary and Capricious

As the majority stated, this Court uses the "whole record" standard of review pursuant to the North Carolina Administrative Procedure Act to review an agency's final decision, which requires consideration of whether the agency's decision is justified by substantial evidence. N.C.G.S. § 150B-51(b) (2023); *N.C. State Bar v. DuMont*, 304 N.C. 627, 643 (1982). I agree with the Court of Appeals' decision and would hold that the Commission's final agency decision must be overturned because the decision was arbitrary and capricious.

This Court has recognized the Commission's authority to impose standards for certification of justice officers. *Britt v. N.C. Sheriffs' Educ. & Training Standards Comm'n*, 348 N.C. 573 (1998). The Commission's "good moral character" rule, requires that all justice officers shall "be of good moral character as defined in" *In re Legg*, 325 N.C. 658 (1989); *State v. Benbow*, 309 N.C. 538 (1983); *In re Willis*, 288 N.C. 1 (1975), *appeal dismissed* 423 U.S. 976 (1975); *State v. Harris*, 216 N.C. 746 (1940); *In re Dillingham*, 188 N.C. 162 (1924); *In re Applicants for License* 143 N.C. 1 (1906); and "later court decisions." 12 N.C. Admin. Code 10B.0301(12) (2024).

The Commission's own findings and conclusions relating to good moral character directly support the conclusions reached by the ALJ, the trial court, and the Court of Appeals. Conclusion of Law 24 in the Commission's final agency decision

provides that Sheriff Greene and Principal Johnson testified, "[Officer Devalle] has rehabilitated and rebuilt his character since being fired by the Patrol, and as a deputy sheriff, and as school resource officer and coach at East Columbus High School . . . [Officer Devalle's] service . . . has been nothing but exemplary both of that service and of [his] character while engaging in that service."

As the majority recognized, good moral character requirements are vague but are not per se unconstitutional. *See In re Willis*, 288 at 13 (1975) (holding that "good moral character" requirement is a constitutionally permissible standard despite its broad dimensions). The application, though, of a vague good moral character requirement can be arbitrary and capricious. The term "good moral character" is

> by itself . . . unusually ambiguous. It can be defined in an almost unlimited number of ways, for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer. Such a vague qualification, which is easily adapted to fit personal views or predilections, can be a dangerous instrument for arbitrary and discriminatory denial . . . .

*Konigsberg v. State Bd. of Bar Exam'rs*, 353 U.S. 252, 262–63 (1957).

This Court has defined "good moral character" in the context of admission to the North Carolina State Bar. Those are the precedents that the Court of Appeals applied. *Devalle*, 289 N.C. App. at 21 (citing *In Re Rogers*, 297 N.C. 48 (1979); *In Re Applicants for License*, 191 N.C. 235 (1926); *In Re Willis*, 288 N.C. 1 (1975); *In Re Dillingham*, 188 N.C. 162 (1924)). We have also said that isolated instances of conduct are insufficient to properly conclude that someone lacks good moral

character. *Rogers*, 297 N.C. at 58–59. "Whether a person is of good moral character is seldom subject to proof by reference to one or two incidents," except for when those isolated incidents are especially egregious or severe. *Rogers*, 297 N.C. at 58; *see also Willis*, 288 N.C. at 13. These cases do not involve the law enforcement profession, a different profession that presents different considerations and, therefore, may have a different definition for "good moral character" if the Commission defined the term beyond citing to case law on attorney licensure.

As a result, the Commission's current lack of a more pertinent and definitive definition of "good moral character" in the context of law enforcement officers fails to put law enforcement officers on notice of what constitutes good moral character. No North Carolina appellate court has provided clarity on the term as applied in the law enforcement context. How can the Commission expect law enforcement officers to meet a moral character requirement without a clear definition—by deciphering case law as non-attorneys? While the majority acknowledges this lack of clarity and now urges the Commission to define "good moral character" rather than citing to case law, Officer Devalle operated under the Commission's and our precedents' vague definitions.

The Court of Appeals cited to the Commission's final agency decision, which is not publicly available, in *Royall v. N.C. Sheriffs' Educ. And Training Standards Comm'n*, 09 DOJ 5859, Final Agency Decision (5 Jan. 2011), to point out the Commission's failure to apply the "same standard" to Officer Devalle, "which

indicates arbitrary, discriminatory or capricious application of the good moral character standard" by the Commission. *Devalle*, 289 N.C. App. at 27.

The Court of Appeals in *Devalle* summarized *Royall* as follows. The conduct at issue in *Royall* involved the petitioner releasing sensitive information he obtained through his service with the Yadkin County Sheriffs' Office about ongoing investigations on certain social media websites. *Devalle*, 289 N.C. App. at 21–22. In that case, the ALJ "recommended a finding of a lack of good moral character by the petitioner and, as a result, recommended his certification be revoked for four months." *Id.* at 22. Despite the recommendation, the Commission in *Royall* "concluded there was no factual or legal basis to support a finding the petitioner presently lacked the requisite good moral character to warrant his revocation." *Id.* The Commission explained: "While having good moral character is an ideal objective for everyone to enjoy, the lack of consistent and clear meaning of that term within the [Commission's] rule, and the lack of clear enforcement standards or criteria for application of the rule, renders enforcement actions problematic and difficult." *Id.* (alteration in original). Consequently, the Commission in *Royall* concluded that "any *suspension or revocation of an officer's law enforcement certification based on an allegation of a lack of good moral character should be reserved for clear and severe cases of misconduct.*" *Id.* (emphasis added). The Commission referenced the "substantial evidence" of good moral character Royall presented, including testimony on his behalf. *Id.* at 22–23 ("He's the kind of guy, if he's cutting a watermelon, he'll give you

the best piece."). In light of Royall's exemplary history of good moral character and professionalism in law enforcement, the Commission did not find that Royall lacked good moral character. *Id.*

The Commission's denial of Officer Devalle's certification reinforces that the lack of a consistent and clear meaning of "good moral character" and the lack of clear enforcement standards renders enforcement actions "problematic and difficult," or, in other words, arbitrary and capricious. The Commission's standard, articulated in *Royall*, indicated it was Officer Devalle's burden to present evidence of his good moral character; and when Officer Devalle provided that evidence through credited testimonies of multiple witnesses who agreed that Officer Devalle was presently of good moral character, the Commission nonetheless suspended his certification. The Commission, despite the standard as set forth in *Royall*, did not make the make a finding that Officer Devalle's actions with the Patrol presented a case of clear and severe misconduct. The Commission did not present evidence at the hearing to contradict testimony about Officer Devalle's performance of his duties as a deputy sheriff in Columbus County or as an SRO. The Commission's own witnesses, who knew of Officer Devalle's prior misconduct, did not testify that Officer Devalle "lacked good moral character, either generally, or to serve as a deputy sheriff in this State." Thus, the Commission's decision to deny Officer Devalle's certification *is* arbitrary because it leaves law enforcement officers like Officer Devalle without notice as to what must one do to prove good moral character or what falls within "clear and severe

cases of misconduct." By focusing on this instance of misconduct in an otherwise unproblematic nineteen-year career, though, the Commission acted in conflict with its own standard.

The Commission's regulations provide that a certification can be indefinitely suspended, but only so long as the applicant lacks the qualifications specified in 12 N.C. Admin. Code 10B.0301—including good moral character. 12 N.C. Admin. Code 10B.0205(3) (providing that the period of sanction continues "so long as the stated deficiency, infraction, or impairment continues to exist, where the cause of sanction is . . . failure to . . . maintain the minimum standards of employment or certification pursuant to 12 [N.C. Admin. Code] 10B.0301."). Thus, under this regulation, if the stated deficiency, infraction or impairment does not exist, then moral character can be rehabilitated or restored. But the Commission's denial comes after acknowledging that the Commission "presented [no] evidence at hearing" concerning any of Officer Devalle's conduct or activities since 2016 or his present moral character. The Commission even conceded that despite Officer Devalle's conduct in 2016, he "presented significant evidence demonstrating that [he] has rehabilitated and rebuilt his career[.]" Thus, these proceedings provide no guidance as to what Officer Devalle could have done differently to satisfy the Commission of his rehabilitation.

The Commission can seemingly make its certification decisions based on whether it perceives an applicant's behavior in the recertification process as sufficiently self-flagellating for the sake of the appearance of candor, rather than

genuine candor. This performative requirement is not new to this Court's jurisprudence, though this requirement continues to be troubling. For example, courts have sustained an adjudication of neglect if a parent has not taken responsibility for abuse even if the parent denies the abuse and the issue involves a different child or could be explained by other means. *See In re D.W.P.*, 373 N.C. 327 (2020) (reinforcing the principle that a parent's failure to recognize abuse—and the cause of it—can sustain a adjudication of neglect, even for a sibling who has not been physically harmed). Taking responsibility for wrongdoing matters. But if future employment is going to depend on whether an application exhibits sufficient contrition, without defining what sufficient contrition includes, the door to arbitrariness just opens wider.

## A. Lack of Clarity as to Relevant Time Frame Adds to Arbitrariness and Capriciousness

Further adding to the arbitrariness is the lack of clarity as to the right time frame during which to assess whether one has good moral character or has been rehabilitated. The Commission took two years after Officer Devalle's termination to indefinitely deny his certification. The Commission heard two years' worth of evidence demonstrating that he had dutifully served as SRO and assistant football coach at East Columbus High. The Commission adopted the factual findings from the ALJ, including testimonies on behalf of Officer Devalle's good moral character. Under the majority's approach, at least toward the end, all of that is irrelevant

because he applied for recertification too quickly after his termination. But that approach, and the Commission's decision, would leave law enforcement officers in a position where they must choose between employment and the possibility of recertification—however long that process may take. And the Commission's standard is unclear about how long law enforcement officers must wait to reapply for certification. In my view, the Court of Appeals correctly considered *all* of the evidence concerning Officer Devalle's *present* moral character to determine that there was a lack of substantial evidence to support the Commission's denial. Good moral character should be judged at the time of the certification decision. Such a conclusion aligns with the holding of the Supreme Court of the United States. *See Schware v. Board of Law Examiners*, 353 U.S. 232, 246 (1957) (stressing that the pertinent time for the assessment of moral character is the present time).

Of course, any inquiry into an individual's current character should include an inquiry into their past behavior. *See In re Legg*, 337 N.C. 628, 634 (1994). *In re Legg* involved the denial of bar admission, and the applicant argued that the Board of Law Examiners were required to inquire only into his "current" good moral character in reaching its decision. *Id.* at 633. This Court disagreed, holding that past behavior was an appropriate part of the Board's inquiry. *Id.* at 634. This Court noted the Board's rules required the applicant to be of good moral character at the time of standing for the bar examination and at the time a license to practice law is issued. *Id.* at 635.

Here, of course the Commission may look to past misconduct, but instead of balancing past conduct against current conduct, the Commission overwhelmingly relied on Officer Devalle's past misconduct and its perception of his cross-examination testimony at the hearing, as opposed to the more recent evidence of his current employment and accomplishments. The Commission acknowledged "significant evidence demonstrating that [Officer Devalle] has rehabilitated and rebuilt his career since 2016 and 2017" and that he "exhibited highly favorable traits, including but not limited to helping, teaching, and serving as positive role models for students at East Columbus High School not only as a school resource officer, but as a coach in two sports." The Commission's ultimate decision to deny certification, then, was arbitrary and capricious.

## B. The Commission's Failure to Conduct an Independent Investigation Exacerbated the Arbitrariness of the Final Agency Decision

It is also troubling that the Commission made a decision—one that would significantly impact a person's livelihood—without conducting its own investigation. In *Rogers*, this Court reversed an applicant's denial to sit for the Bar Examination because the evidence did not sufficiently support the denial. *Rogers*, 297 N.C. at 49. Most relevantly, the record revealed that the Board did not sufficiently investigate the alleged charges against Mr. David Henry Rogers, even though Rogers offered fourteen witnesses to testify on behalf of his good character. *Id.* at 52. This Court affirmed that the applicant asserting his good moral character bears the burden to

prove it; however, when a Board or Commission attempts to rebut that proof by showing some adverse fact, it should bear the burden of proving that fact. *Id.* at 59. Indeed, the rules under which the Board operates contemplate that it make such findings of fact when necessary. *Id.* at 57. "Rule .1404 speaks of the manner in which 'findings of fact by the Board' shall be reviewed by the Superior Court." *Id.* Under N.C.G.S. § 84-24, the Board is the primary investigatory and fact-finding agency in the bar admissions process. *Id.*

Here, before taking adverse action against an individual for a violation, "the Division shall investigate the alleged violation, and when required by the Director, shall present a report of its findings to the Probable Cause Committee of the Commission." 12 N.C. Admin. Code 10B.0201(b). In the ALJ's administrative order, the evidence and the ALJ's findings made it clear that the Commission did not conduct its own investigation in violation of 12 N.C. Admin. Code 10B.0201. The present findings were that Officer Devalle had rehabilitated his character in the two years he spent rebuilding his career as a deputy sheriff and SRO at East Columbus High School. The Commission, by incorporating the ALJ's findings, affirmed that it, too, found their present testimonies credible. The Commission's insistence, then, on using incorporated statements from a different investigation—one that it did not independently conduct nor verify—to come to a different conclusion on the issue of recertification suggests that it is in violation of its fact-finding duties and made its decision arbitrarily.

### III.  Conclusion

The majority's opinion affirms a vague standard that fails to put law enforcement officers on notice of what they need to do to reestablish good moral character.  The majority suggests that law enforcement officers seeking to regain meaningful employment must somehow satisfy the Commission through demonstrable acts of contrition, but what is sufficient remains unclear.  The majority does not answer the question of *how* law enforcement officers—or any licensed professional with a moral character requirement—can demonstrate rehabilitation of their character—certainly presenting evidence of rehabilitation of character was not sufficient here—or what time frame is relevant when determining whether they have rehabilitated.  The majority holds it against Officer Devalle for reapplying for certification two days after his termination, but it does not require the Commission to define the appropriate timing for reapplication.  I take from the subtext of the majority's opinion that if Officer Devalle applied for certification today, he would likely be approved, and perhaps he will read it that way, too.  But employees should not have to read between the lines or guess when they might regain eligibility for employment.  I agree with the Court of Appeals' holding that the final agency decision was arbitrary and capricious, and so I respectfully dissent.

Justice EARLS joins in this dissenting opinion.